# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

POLYSCIENCES, INC.,

                  Plaintiff,

v.

JOSEPH T. MASRUD,

                  Defendant.

Civil Action No.

## VERIFIED COMPLAINT

Plaintiff, Polysciences, Inc. ("Polysciences"), brings this Verified Complaint against Defendant, Joseph T. Masrud ("Mr. Masrud or "Defendant"), and alleges as follows:

### Nature of Action

1.    This is an action by Polysciences against its former employee, Mr. Masrud, arising from his misappropriation of trade secrets and other proprietary and confidential information, which Mr. Masrud obtained during his employment with Polysciences, and improperly used to launch copycat versions of Polysciences products.

2.    Defendant's unlawful acts include misappropriation of trade secrets under the Pennsylvania Uniform Trade Secrets Act ("PUSTA") and the Defend Trade Secrets Act of 2016 ("DTSA"), 18 U.S.C. § 1836(b)(1); and breach of his Confidentiality & Proprietary Agreement he entered into on or about January 5, 2014 as a condition of his employment with Polysciences. Mr. Masrud has used the misappropriated information to offer copycat versions of two highly specialized and valuable Polyethylenimine ("PEI") transfection reagents sold by Polysciences. Mr. Masrud sells his copycat products through his wholly owned company, Serochem, a company Mr. Masrud formed just prior to terminating his employment at Polysciences.

3.     Polysciences is a decades-old manufacturing company, established in 1961, with a long history of manufacturing unique, high quality chemicals including high-purity monomer and polymer products used in many scientific applications, medical devices, and medical research.  Polysciences is a trusted partner of numerous reputable pharmaceutical and biotechnology companies developing gene/cell therapy products.  During the last decade, Polysciences has developed and introduced a range of unique PEI transfection reagents in various quality grades (medical grade versions compliant with FDA's current Good Manufacturing Practices ("cGMP") and industrial grade versions used in research and development).

4.     As more fully set forth below, Mr. Masrud's responsibilities as Business Development Manager, Business Manager and then Director of Laboratory Products at Polysciences provided him access to all of Polysciences trade secret and other confidential and proprietary information regarding Polysciences PEI products including both technical information and strategic commercial information developed and gathered by Polysciences over years of effort at a substantial cost.  This proprietary trade secret and confidential information includes, without limitation Polysciences: step-by-step, detailed manufacturing instructions outlining raw materials, process parameters, and other procedures to synthesize the PEI products, prepare the solution, and package the materials; design of the PEI chemistry, including molecular weight, molecular structure, product form , and process and compounds used to create the desired pH of the solution; key raw material supplier data and specifications; sourcing of novel and rare supply materials; internal test procedures and methods to determine key material characteristics; identification and selection of third party laboratories for testing of sterility, mycoplasma, heavy metals and endotoxin; identification and selection of third party testing partners to determine transfection efficiency, expression, and cell viability; selection of specific

sterile filtering process parameters to avoid techniques that could adversely impact polymer properties; strategy to pursue development for improved solubility; the neutralization process and compounds used to produce the desired pH; customer lists including customer specific pricing and product specifications, customer contacts, product pricing and cost details and strategy, margins, competitive strategy and product positioning, and sales history for top PEI products and future forecasts; and receipt of confidential information from customers for specific product-related projects (collectively "Polysciences Trade Secrets").

5.      Mr. Masrud could not have launched his PEI products at Serochem in a matter of months after leaving Polysciences without using his knowledge of Polysciences Trade Secrets and confidential information.  Indeed, Mr. Masrud had no experience in the business or with PEI products in particular prior to joining Polysciences.  Further, Mr. Masrud spent years at Polysciences working on the launch of Polysciences' transfection PEI products, including its two most recent PEI products, yet within months of leaving Polysciences, he launched the two PEI products that the Serochem website claims are at least the same quality as Polysciences PEI products but at a much cheaper price.  In fact, Mr. Masrud claimed in responding to Polysciences cease and desist letter that Serochem's products "provide a significant performance benefit over Polysciences' products at a lower price point."  Attached hereto as **Exhibit 1** is a true and correct copy of the Letter from Mr. Masrud's attorney to Fox Rothschild LLP dated July 16, 2020.

6.      It is easy to cut the price of a product when you have not paid for the development of it.  More to the point, Polysciences product specifications and cost and pricing data are part of its trade secrets and Mr. Masrud's claim in his letter is an admission that he has used that information in launching his products "at a lower price point."  See Ex. 1.

7.      Mr. Masrud's failure to abide by the Confidentiality & Proprietary Agreement and his theft of Confidential & Proprietary information is not only a breach of his contract but also

violates the Pennsylvania's Uniform Trade Secrets Act and the federal Defend Trade Secrets Act.

8.      Plaintiff seeks an order for injunctive relief to stop Mr. Masrud and those acting in concert with him from misappropriating Polysciences Trade Secrets; to discontinue offers of sales of PEI products developed or sold by misappropriating Polysciences Trade Secrets and confidential information and enjoining the sale of any additional PEI products developed or sold by misappropriation or use of Polysciences Trade Secrets and confidential information, and such additional remedies as are available in law and equity.

## Parties

9.      Polysciences is a corporation formed under Pennsylvania law on October 5, 1993, with its U.S. corporate headquarters and U.S. principal place of business located in Pennsylvania.

10.      Mr. Masrud is an adult individual who, upon information and belief, resides in Minnesota, and is a citizen of Minnesota for diversity purposes.

11.      Mr. Masrud is President of Serochem, a corporation he formed under Minnesota law on June 5, 2019, with its principal place of business located in Bloomington, Minnesota.  On information and belief, Mr. Masrud is the sole shareholder of Serochem.

## JURISDICTION AND VENUE

12.      Subject matter jurisdiction exists under 28 U.S.C. § 1332 in that Polysciences and Defendant are citizens of different states, and the amount in controversy exceeds $75,000, exclusive of interests and costs.

13.      Subject matter jurisdiction also exists under 28 U.S.C. § 1131, because this dispute arises, in part under the DTSA, 18 U.S.C. § 1836(b)(1), and as provided for in 28 U.S.C. § 1367, this Court shall exercise supplemental jurisdiction over the state law claims asserted herein.

14.     As provided for in 28 U.S.C. § 1391(b)(2), venue is proper in this judicial district because a substantial part of the events or omissions giving rise to Polysciences' claims occurred in this judicial district and a substantial part of Polysciences' confidential business information and trade secrets originated in this judicial district.

## FACTUAL BACKGROUND

### POLYSCIENCES BUSINESS AND PEI PRODUCTS

15.     Polysciences is a family owned, trusted, and well-respected global manufacturer and distributor of high-purity monomer and polymer products for the scientific community. Polysciences has a collection of small to mid-scale manufacturing processing and packaging equipment, which it uses to manufacture a broad array of products, including PEI transfection reagents, that are widely used for various scientific applications, including the development and manufacturing of viral vectors for cell-and gene-based therapies.

16.     Polysciences has three broad divisions: (1) Laboratory Products/Catalog; (2) Custom Synthesis/Specialty Products; and (3) Contract Manufacturing and Packaging.

17.     Lab Products' PEI Products are difficult to reverse engineer due to the statistical nature of their properties, and thus they become inimitable once they are used in development or production processes.

18.     Polysciences worldwide reputation and good will emanates from its extremely high standards, quality control, and commitment to excellence and its customers.  Its quality control and assurance programs includes: ISO 13485:2016 Certification; Food and Drug Administration Registration; and Certification to Society of Chemical Manufacturers and Affiliates ("SOCMA's") ChemStewards® Management System.  ISO 13485:2016 specifies requirements for a quality management system where an organization needs to demonstrate its ability to provide medical devices and related services that consistently meet customer and

applicable regulatory requirements.  ChemStewards® is SOCMA's environmental, health, safety and security performance improvement program.

19.     The manufacturing facilities at Polysciences include multi-step synthesis, distillation and drying, recrystallization and filtration & clean room operations working within FDA/GMP (Good Manufacturing Practices) guidelines, specifically developed to suit their customer's specialized needs.

20.     FDA ensures the quality of drug products by carefully monitoring drug manufacturers' compliance with its GMP regulations, which contain minimum requirements for the methods, facilities, and controls used in manufacturing, processing, and packing of a drug product.  The regulations, which appear in several parts of the Code of Federal Regulations, including sections in parts 1-99, 200-299, 300-499, 600-799, and 800-1299, make sure that a product is safe for use, and that it has the ingredients and strength it claims to have.

21.     Polysciences sells its products to a broad customer base directly with valued customers who have relied on its expertise and commitment to customer service and confidentiality, through affiliates and distributors, at national and international trade shows and events; and through its catalogs and websites.

22.     The linear transfection PEI products are the fastest growing and most profitable products in the Lab Products business, which focuses on primarily monomers and polymers that are used in medical device, pharmaceutical and industrial research and development applications. The growth in this product line followed a strategic research, development and marketing analysis and the success of sales of these products resulted from an in-depth understanding of their successful applications in research laboratories, which Mr. Masrud learned only through his employment at Polysciences and access to the Polysciences Trade Secrets and confidential information.

23.     Transfection is the process of introducing nucleic acids (DNA and RNA) into cells utilizing means other than viral infection, to study the function of genes or gene products, by enhancing or inhibiting specific gene expression in cells, and to produce recombinant proteins in mammalian cells.  Polysciences is one of only three commercial entities who has consistently demonstrated the ability to provide quality PEI transfection reagents for the research, development and commercial supply of biological treatments for humans.  The other companies with demonstrated ability to supply such products are Sigma-Aldrich and Polyplus-transfection.

24.     PEI can exist in different forms (solid and liquid of varying concentrations) and configurations, including branched or linear structures with different molecular weights. Likewise, PEI products can be produced in a variety of ways, resulting in varying quality and efficiencies with respect to different applications or uses.  Thus, production of each type of PEI products requires careful design and development in order to have consistent quality and performance for the specified application.

25.     Using Polysciences Trade Secrets, Polysciences manufactures various PEI products made from PEI polymers with different:  molecular weights, structures (branched and linear), forms (powder or liquid), and production methods ( cGMP and non-cGMP versions).

26.     Polysciences has spent over 15 years and millions of dollars in total developing its PEI products.

27.     The Polysciences transfection PEI products have a high transfection efficiency with low cytotoxicity making them superior to those offered by other companies worldwide, including Mr. Masrud's products.  Polysciences PEI reagents also have high scalability and flexibility and are suitable for transfection in a wide range of cell lines/types.

28.     Polysciences' PEI transfection products are also difficult to imitate or substitute without knowledge of the Polysciences Trade Secrets, which gives Polysciences a strong competitive position.

29.     Polysciences provides ready-to-use, powerful, trusted, and cost-effective transient transfection reagents, including Transporter™ 5 and PEI MAX.  These industrial, non-cGMP versions of Polysciences' PEI transfection products are used early in biomedical research and development before the medical grade, but more costly, cGMP version is required for commercial product development and production.

30.     There are several critical factors that influence biotherapeutic manufacturers to use Polysciences PEI in their process development through clinical trials and the commercial manufacturing process.  Polysciences transfection reagents are of consistently high-quality (R&D and GMP grades); less cytotoxic but with high transfection efficiency; highly reproducible viral/protein titers at any scale (smaller culture dish to large scale bioreactors); flexible (suitable for stable and transient transfection with a wide range of cell lines); all materials are sourced and manufactured in US in an ISO certified facility under an ISO 13485 Quality System; and are cost effective for the applications in which they are used.

31.     The development of the cGMP PEI transfection products was Mr. Masrud's responsibility as Director of Lab Products from September 2016.

32.     Polysciences takes many precautions to protect its valuable trade secrets and proprietary confidential information including:

a.  requiring as a condition of employment that all employees (including Mr. Masrud) execute a Confidentiality and Proprietary Agreement requiring each employee to keep confidential all of Polysciences proprietary confidential information.  These agreements specifically prohibit, among other things, employees from using or disclosing Polysciences'

Confidential information and from misappropriating Polysciences' Proprietary information during or after the term of the employment (Attached hereto as **Exhibit 2** is a true and correct copy of Mr. Masrud's executed agreement from January 5, 2014, (see section b));

b. maintaining and updating employee manuals, policies and practices that require employees to protect all confidential information as well as reminding employees of their obligations pursuant to the Confidentiality and Proprietary Agreement, and of their obligations to maintain building security, properly dispose of confidential documents when necessary, protecting confidentiality of all customer related information including pricing and customer supplied confidential information regarding the customers use of the Polysciences products.  The monitoring and enforcement of the policies includes requiring employees to acknowledge receipt and understanding of these policies and procedures. Attached hereto as **Exhibit 3** are true and correct copies of Polysciences Workplace Handbook and Mr. Masrud's acknowledgement of receipt dated Jan. 5, 2014; and attached hereto as **Exhibit 4** are true and correct copies of  Polysciences Workplace Policies and Practices: CSI (Conflicts, Secrets, Interests) which replaced the Workplace Handbook, and Mr. Masrud's acknowledgement of receipt dated July 7, 2017;

c. protecting Polysciences confidential information and data on  password protected  servers;

d. limiting access to the Polysciences Trade Secrets to only a few Polysciences senior employees, which is achieved by giving only these select employees access to the files on the Polysciences server and  securing a singular hard copy of design files containing certain Trade Secret information in a quality assurance managers file cabinet;

e. monitoring Polysciences' employees compliance with its confidentiality requirements and upon  identification  of  violations  of  Polysciences'  Confidentiality  &  Proprietary

Agreement, taking prompt steps to correct the issue, including remedial actions with the employees involved; and

f.   entering into appropriate confidentiality agreements with Polysciences customers, suppliers and other business partners to protect both Polysciences and the partner's valuable proprietary information.

33.     As part of the Confidentiality & Proprietary Agreement, Mr. Masrud signed on January 5, 2014, as a condition of his employment he explicitly agreed not to use any "Confidential Information and/or Proprietary Information of Polysciences and/or disclose such Confidential Information and/or Proprietary Information to any third party, person, firm, corporation, or other entity for any reason or purpose whatsoever unless Employee first obtains the written consent of Polysciences' President: during or after the term of employment with Polysciences  *See* Ex. 2.

34.     Mr. Masrud in fact not only signed the Confidentiality Agreement but on at least one occasion in September 2019, he was reminded of the obligations to maintain the confidentiality of key trade secret information when he mistakenly attempted to share such information outside the organization.  See attached hereto as **Exhibit 5** a true and correct copy of a Letter to Mr. Masrud from Fox Rothschild LLP, dated September 23, 2019.

**POLYSCIENCES PEI PRODUCT SUCCESS**.

35.     Polysciences has offered two PEI products for more than 15 years.  Linear PEI MW 25,000 (PN 23966) was released first, followed by PEI Max, MW 40,000 HCl salt (PN 24765).  Both materials are used in a range of applications, but the most common today is transient transfection for viral vector and antibody production.  Polysciences also offers a ready to use versions of each under the "Transporter" mark-Transporter 5™ Transfection Reagent 5 ml (PN 26008-5) and Transporter 5™ Transfection Reagent 50 ml (PN 26008-50).

36.     Although PEI has been used by academics for decades, only recently has PEI's use expanded to later stage development, clinical trials and pre-commercial activities.  In fact, Polysciences PEI products were not marketed as transfection reagents until 2015.  While PEI can be used in a range of applications, the most valuable and profitable are use in transient transfection for viral vector and antibody production.

37.     Sales of PEI products have increased eight-fold after becoming an area of focus for Polysciences in 2015, and since 2017, PEI products account for 75% of projected growth for the Lab Products group.

38.     Polysciences conducted a strategic analysis of its PEI products in 2015 that identified a significant growth opportunity if Polysciences could provide cGMP certified PEI products in a solution and powder form ("cGMP PEI Products").  Customers were already buying industrial grade PEI products from Polysciences for research and development.

39.     Polysciences spent four years developing the cGMP PEI Products for use in clinical trials and commercialization which required the use of medical grade, cGMP PEI Products, launching the cGMP PEI Products in middle of 2019.

40.     Polysciences invested over $600,000 in out of pocket expenses in developing these new products and countless hours of internal management and team effort to develop the new GMP PEI Products and exploit Polysciences established market position with PEI.  As hoped, the launch of the GMP PEI Products in 2019 led to explosive growth in Polysciences PEI product sales.

41.     Polysciences' solution — MAXgene™ GMP Transfection Reagent — and as a powder — MAXgene™ GMP Transfection, Powder capitalizes on the efficiency and scalability of Polysciences' PEI MAX, while adding the validation process and regulatory components necessary for moving into clinical and commercial manufacturing.

42.     Polysciences' proprietary quality and manufacturing programs, transfection efficiency, quality of products, and manufacturing processes are highly valuable trade secrets that set Polysciences apart from its competitors.

43.     Mr. Masrud, as director of the division responsible for the PEI product line, was well aware of the unique and substantial opportunity created for Polysciences by the substantial investment made in the PEI product line by Polysciences.

**MR. MASRUD'S EMPLOYMENT AT POLYSCIENCES**

44.     Polysciences employed Mr. Masrud as a full time employee from January 6, 2014 until June 26, 2019.

45.     During his tenure with Polysciences, Mr. Masrud held three different positions in the Lab Products Group: Business Development Manager, from January 2014-June 2015; Business Manager, from July 2015-September 2016; and Director, from September 2016, July 2019.

46.     After terminating employment, Mr. Masrud continued as a consultant for Polysciences Lab Products Division through his newly formed company, Serochem, with a focus on the PEI line and launch of the new PEI GMP products.  However, the consultancy was not successful and was terminated in September 2019.

47.     Mr. Masrud signed the Confidentiality & Proprietary Agreement ("the Agreement") on January 5, 2014, which amongst other provisions, prohibited him from using or disclosing Polysciences' Confidential information and from misappropriating Polysciences' Work Product during or after the term of the employment.  See Ex. 2.

48.     The Agreement also required Mr. Masrud to promptly

"deliver to Polysciences all property . . .and Confidential Information and Proprietary Information of Polysciences including, but limited to, drawings, blueprints, manuals, letters, notes, notebooks, reports, equipment, and all other

materials of a secret, proprietary, or confidential nature relating to Polysciences; business and which are in possession of under the control of Employee including all copies thereof regardless of whether such Confidential Information and/or Proprietary Information was: developed, compiled, or made by Employee; made available to Employee; or otherwise used by Employee during the term of this Agreement." See Ex. 2.

49.     The Agreement includes an acknowledgment by the Employee that "immediate and irreparable damage will result to Polysciences if Employee breaches any of the terms of this Agreement." The Employee also consents to the jurisdiction of courts of the Commonwealth of Pennsylvania (including the United States District Court for the Eastern District of Pennsylvania)." See Ex. 2.

50.     Mr. Masrud acknowledged that he had received and read Polysciences Workplace Handbook in January 2014 and its replacement, Polysciences Workplace Policies and Practices: CSI (Conflicts, Secrets, Interests) in July 2017. Among the key provisions of these documents are requirements that employees protect all confidential information, reminders of the employees obligations pursuant to the Confidentiality and Proprietary Agreement and specify, among other things, building security, document disposal, maintenance of privacy and customer confidential information. See. Ex. 3; Ex. 4.

51.     As is clear from Mr. Masrud's resume, Mr. Masrud had no prior experience with biologic products and in particular PEI transfection reagents before working at Polysciences. Attached hereto as **Exhibit 6** is a true and correct copy of Mr. Masrud's resume.

52.     During his employment at Polysciences, Mr. Masrud had responsibility for, among other things: identification and development of new opportunities in product development, design and implementation of improvements to Lab Products operations; profit and loss of the Lab Products division, introduction of new, high growth medical device polymers and gene transfection materials, and management of customer services.

53.     During his employment, Mr. Masrud was responsible for the research, development and oversight of PEI products and as Director of Lab Products from September 2016 until June 2019 oversaw the development of the cGMP PEI Products.

54.     Polysciences invested over $600,000 in out of pocket expenses and years of internal effort in the development and marketing of its PEI Products, which involved meticulous development of manufacturing processes and product specifications, including in many cases trial and error to determine the preferred product manufacturing and supply processes and details as well as the preferred product recipe.

55.     As Development Manager, Business Manager, and Director of the Lab Products Group Mr. Masrud had access to and had to utilize Polysciences Trade Secrets.

56.     In his leadership roles in the Lab Products Group Mr. Masrud had access to a license to the section of Polysciences' password protected database that contained the trade secret and confidential information meticulously developed by Polysciences over years of effort.

57.     As Director of the Lab Products Group, and during the development of the cGMP PEI products, a multi-year endeavor from 2015-2019, Mr. Masrud had access to and utilized Polysciences Trade Secrets using its password-protected database.

58.     Polysciences launched sales of its cGMP PEI solution and powder in early September 2019, after a multi-year endeavor to manufacture, test, and validate these products. Polysciences' PEI product sales tripled in 2019 and are expected to triple again in 2020, making it the fastest growing and most profitable product line of Polysciences Lab Group with anticipated continued substantial growth after 202, provided illegal misappropriation of Polysciences Trade Secrets can be curtailed.

59.     The cGMP PEI Products have huge potential growth for Polysciences and are one of the most significant products ever added to the business unit.

60.     On or around January 2019, Mr. Masrud told Andrew Ott, Polysciences Executive Vice President and Chief Operating Officer, that he was leaving Polysciences to relocate to Minnesota where his wife had accepted a job.

61.     Mr. Masrud told Mr. Ott that he would be forming a company, Serochem, but he assured Mr. Ott that he and Serochem would not be pursuing or selling competing products, such as PEI related products.  Rather Mr. Masrud stated that he was interested in developing a consulting business and perhaps some downstream biological service products that were very different from what Polysciences offers for sale.

62.     Based on Mr. Masrud's assurances, Polysciences engaged Mr. Masrud through Serochem as an independent contractor from July 1, 2019 to September 6, 2019.  On August 20, 2019, Mr. Masrud emailed to his personal email at jemasrud@gmail.com a document titled "Polysciences PEI Quality Guide" which contained a comparison of Polysciences' specifications for non-cGMP powder, non-cGMP solution, and cGMP solution.  Attached hereto as **Exhibit 7** is a true and correct copy of the email from joseph.masrud@polysciences.com to jemasrud@gmail.com, dated August 20, 2019.  The Polysciences PEI Quality Guide comparison is itself a highly confidential trade secret comparison and further contains information on each product that is also highly confidential trade secrets.

63.     Mr. Masrud has never returned the Polysciences PEI Quality Guide nor any other Polysciences confidential information since he left Polysciences.

64.     Polysciences scrutinized the Serochem website regularly since it first appeared on the internet.

65.     On July 7, 2020 the first two products offered on the website were posted.  Those products are PEI Prime™ Powder, Transfection Grade Linear Polyethylenimine and PEI Prime™ AQ 1 mg/mL Liquid Transfection Reagent.

66.     Upon information and belief, Serochem's products are copycat versions of Polysciences non-cGMP PEI Products that Mr. Masrud learned how to make and market from access to Polysciences Trade Secrets while employed by Polysciences.

67.     On July 13, 2010, the Serochem website included "PEI Prime™ Data for CHO Suspension" where PEI Prime™ is compared to popular transfection-grade PEI, including Polysciences PEI products.  There was also a link to an article, "Comparative study of polyethylenimines for transient gene expression in mammalian HEK293 and CHO cells" which discusses the superior performance of Polyscieinces PEI products.  Attached hereto as **Exhibit 8** is a true and correct copy of the Serochem webpage downloaded on July 13, 2020 and attached hereto as **Exhibit 9** is a true and correct copy of the article.

68.     Upon information and belief, the Serochem website was modified after Mr. Masrud received a Cease and Desist demanding that he stop selling the PEI based products, but the website still describes PEI Prime™ as "a choice reagent for production for recombinant proteins, antibodies and viruses in mammalian expression systems."

69.     On July 8, 2020, Fox Rothschild LLP, representing Polysciences, sent Mr. Masrud c/o Serochem a Cease and Desist letter demanding that he stop selling the PEI based transient transfection reagents and reminding Mr. Masrud of his post-employment confidentiality obligations to Polysciences, which prohibit the misappropriation of trade secrets.  Attached hereto as **Exhibit 10** is the July 8, 2020 letter sent to Mr. Masrud from Fox Rothschild LLP.

70.     On July 16, 2020, Mr. Masrud responded through counsel to the July 8 letter, in which Mr. Masrud flatly refused to stop selling Serochem's PEI Prime Powder and PEI Prime AQ products.  See Ex. 1.  The letter from counsel acknowledged, however, that Mr. Masrud had undercut Polysciences' prices and had essentially sought to design around Polysciences products.

71.     Mr. Masrud, through his counsel, asserts that he was able to complete research and development of the Serochem products starting sometime after September 6, 2019 while acknowledging that Serochem started from zero—no research, no data, no manufacturing equipment or equipment space.  Nonetheless, Mr. Masrud claims, through counsel, that he achieved this incredibly short development time without the use of, reference to or reliance on any of Polysciences Trade Secrets, including those Mr. Masrud emailed himself and never returned.

72.     Out of the two thousand products Mr. Masrud managed when he was Director of Polysciences Lab group,  Mr. Masrud selected to sell two linear, hydrochloride transfection grade PEI products, similar to, if not identical, to Polysciences best-selling PEI transfection products.

73.     To achieve the consistently high quality and high performance of its PEI product, demanded by the customers, Polysciences developed over the years and at great cost unique, confidential proprietary recipes, production procedures and quality control procedures and customer pricing strategy to acquire its market share and hard-earned reputation for high quality cost effective PEI products.

74.     Mr. Masrud, having had no prior experience with the PEI polymers that are difficult to reverse engineer and substitute, could not have researched, developed and manufactured the products he is now selling on the Serochem website, without use of Polysciences Trade Secrets.  Mr. Masrud has inevitably used, directly or indirectly, Polysciences Trade Secrets.

75.     If Mr. Masrud is not stopped, he will continue to misappropriate Polysciences Trade Secrets to sell the non-cGMP PEI products and to create and sell knock-offs of the highly valuable cGMP PEI Products in the future.

76.     As a result, temporary and permanent injunctive relief is needed to prevent the irreparable harm to Polysciences from the sale of these inferior products that cannot be remedied solely with monetary damages necessitating the filing of this lawsuit.

## Count I
## Injunction

77.     Polysciences incorporates by reference the averments of the previous paragraphs as if fully set forth herein.

78.     Mr. Masrud's conduct constitutes a breach of contract and a misappropriation of trade secrets in violation of Pennsylvania's Uniform Trade Secrets Act and the Defend Trade Secrets Act.

79.     Polysciences reminded Mr. Masrud in September of 2019 of his ongoing obligations to Polysciences pursuant to the Confidentiality and Proprietary Agreement he signed in January 2014. Mr. Masrud was also reminded of his confidentiality obligations on numerous other occasions including, without limitation when he acknowledged by receipt of Polysciences employee handbooks in 2014 and their confidentiality policies and procedures in 2017.

80.     Despite assuring Polysciences that he had no intention of competing with Polysciences PEI products upon formation of his company, Mr. Masrud's the first, and currently only products sold by his company Serochem are copycat versions of Polysciences non-cGMP PEI transfection products.

81.     Mr. Masrud could not have launched the Serochem PEI products without using Polysciences Trade Secrets and confidential information.

82.     By virtue of the forgoing, Polysciences has demonstrated a likelihood of success on the merits of its claims, and that a balancing of the equities favors the issuance of an injunction against the Defendant.

83.     Polysciences is entitled to injunctive relief against Mr. Masrud because there will be irreparable harm to Polysciences should Mr. Masrud be permitted to continue to disclose and use Polysciences Trade Secrets he has already misappropriated to sell knock-off PEI transfection products obtained through illegal use of Polysciences Trade Secrets.  Polysciences will be irreparably harmed by:

a.   continued sales of transfection PEI products, which are inferior to Polysciences products and sold at a much lower price to undercut Polysciences sales, which will likely immediately and irreversibly syphon customers from Polysciences and result in a loss of customers and sales, erode Polysciences competitive market position and will irreparably damage Polysciences reputation and good will;

b.   future use of Polysciences Trade Secrets to manufacture and sell the highly valuable cGMP PEI Products developed over at least four years and at a cost of over $600,000 in out of pocket expenses;

c.   impermissible use of Polysciences' confidential customer information, and interference with customer relationships which will further irreparably harm Polysciences reputation and good will; and

d.   present economic loss, which is unascertainable at this time, and future economic loss, which is presently incalculable.

84.     The losses that will be suffered by Polysciences as a result of Defendant's actions cannot be fully or adequately compensated in money damages, and Polysciences does not have an adequate remedy at law.

85.     Greater injury will be inflicted upon Polysciences by the denial of relief than would be inflicted on Defendant by granting such relief.

86.     Injunctive relief would be consistent with public policy and in the public's interest, in that it is both necessary and reasonable to protect Polysciences legitimate interests in the Polysciences Trade Secrets.

**Count II**
**Misappropriation of Polysciences Trade Secrets in Violation of the Pennsylvania Uniform Trade Secrets Act**

87.     Polysciences incorporates by reference the averments of the previous paragraphs as if fully set forth herein.

88.     Polysciences owns certain confidential, proprietary, and trade secret information with respect to its PEI products developed at great cost and effort over many years as previously alleged.

89.     Polysciences Trade Secrets have independent economic value, are not generally known to or readily ascertainable by persons outside Polysciences and provide Polysciences with an economic and competitive advantage in the marketplace involving sales of highly technical and valuable viral vector manufacturing applications to pharmaceutical companies, contract manufacturing organizations that are commercializing gene therapies, antibody manufacturers and companies that choose transient transfection.

90.     Through its years of experience, Polysciences also developed precise protocols, business development plans, customer lists including customer pricing and related data, which provides Polysciences a competitive advantage in the marketplace and are part of the Polysciences Trade Secrets.

91.     As a result of Mr. Masrud's employment with Polysciences, Mr. Masrud used, received, and had knowledge of Polysciences Trade Secrets.

92.     Mr. Masrud has used, relied on and/or referred to Polysciences Trade Secrets and Confidential Information to sell, through interstate commerce, Serochem's copycat PEI products.

93.     Mr. Masrud has wrongfully acquired, including through the illegal redirection of Polysciences' confidential documents from Mr. Masrud's Polysciences email to his personal email, disclosed and/or used Polysciences Trade Secrets, and continue to do so, without the express or implied consent of Polysciences, for his own benefit and the benefit of others.

94.     At all relevant times, Mr. Masrud knew or had reason to know that the trade secrets he acquired, disclosed and/or used were wrongfully acquired, disclosed or used.  Mr. Masrud's misappropriation was and continues to be willful, wanton, and malicious, and taken with reckless disregard to Polysciences rights.

95.     Defendant's conduct constitutes a misappropriation of trade secrets in violation of the Pennsylvania Uniform Trade Secrets Act.

96.     Polysciences has made a substantial investment of time, effort, and money into creating and maintaining its confidential information and trade secrets for its business and has made and continues to make reasonable efforts to maintain secrecy of its trade secrets, through its secure portions of its databases to which select few employees have access on an as needed basis; use of Confidentiality & Proprietary Agreements each employee is required to sign; scrutiny of existing and former employees to identify unlawful misappropriation acts and notification to those employees to remind them of their binding legal requirements to protect Polysciences Trade Secrets.

97.     The public policy in favor of protecting Polysciences interest in maintaining its trade secrets outweighs any interest Defendant allegedly may have in using Polysciences Trade Secrets to support themselves in other employment.

98.     As a direct and proximate result of Defendant's misappropriation of Polysciences Trade Secrets, Polysciences has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade

secrets and loss of its brand recognition and goodwill for its PEI products painstakingly developed over years by Polysciences from use of its trade secrets and Polysciences will continue to suffer said injury, loss, harm or damage unless and until Defendant is restrained from his continued misappropriation and exploitation of Polysciences Trade Secrets, including his current sales of PEI products and futures sale of cGMP PEI Products developed or sold from using Polysciences Trade Secrets.

## Count III
## Misappropriation of Trade Secrets in Violation of Defend Trade Secrets Act

99.     Polysciences incorporates by reference the averments of the previous paragraphs as if fully set forth herein.

100.    Polysciences owns certain confidential, proprietary, and Trade Secret information with respect to its PEI products developed at great cost and effort over many years as previously alleged.

101.    Polysciences Trade Secrets have independent economic value, are not generally known to or readily ascertainable by persons outside Polysciences and provide Polysciences with an economic and competitive advantage in the marketplace involving sales of highly technical and valuable testing reagents to biomedical researchers and pharmaceutical companies.

102.    Through its years of experience, Polysciences also developed precise protocols, business development plans, customer lists including pricing and related data, which provides Polysciences a competitive advantage in the marketplace and are part of the Polysciences Trade Secrets.

103.    As a result of Mr. Masrud's employment with Polysciences, Mr. Masrud used, received, and had knowledge of Polysciences Trade Secrets.

104.   Mr. Masrud has used Polysciences Trade Secrets to sell, through interstate commerce, copies of PEI products on the Serochem website, despite Mr. Masrud's prior and intentionally deceptive assurances he would never do so.

105.   Defendant has wrongfully acquired, disclosed and/or used Polysciences Trade Secrets and continue to do so, without the express or implied consent of Polysciences, for his own benefit and the benefit of others.

106.   At all relevant times, Defendant knew or had reason to know that the trade secrets he acquired, disclosed and/or used were wrongfully acquired, disclosed or used.  Defendant's misappropriation was and continues to be willful, wanton, and malicious, and taken with reckless disregard to Polysciences rights.

107.   Defendant conduct constitutes a misappropriation of trade secrets in violation of Defend Trade Secrets Act.

108.   Polysciences has made a substantial investment of time, effort, and money into creating and maintaining its confidential information and trade secrets for its business and has made and continues to make reasonable efforts to maintain secrecy of its trade secrets, through its secure portions of its databases to which select few employees have access on an as needed basis; Confidentiality & Proprietary Agreements each employee is required to sign; designation of confidential documents; scrutiny of existing and former employees to identify unlawful misappropriation acts and notification of those employees to remind them of their binding legal requirements to protect Polysciences Trade Secrets.

109.   The public policy in favor of protecting Polysciences interest in maintaining its trade secrets outweighs any interest Defendant allegedly may have in using Polysciences Trade Secrets to support himself in other employment.

110.     As a direct and proximate result of Defendant's misappropriation of Polysciences Trade Secrets, Polysciences has suffered and continues to suffer immediate and irreparable injury, loss, harm or damage including, without limitation, the misappropriation of its trade secrets and loss of its brand recognition and goodwill from its longtime sales of high quality PEI products and being one of the first to bring both non GMP and GMP PEI Products to the marketplace, and will continue to suffer said injury, loss, harm or damage unless and until Defendant is restrained from his continued misappropriation of trade secrets.

**Count IV**
**Breach of Contract**

111.     Polysciences incorporates by reference the averments of the previous paragraphs as if fully set forth herein.

112.     Polysciences and Mr. Masrud on January 5, 2014 entered into a Confidentiality & Proprietary Agreement (the "Agreement") as a condition of Mr. Masrud employment.  The Agreement prohibits Mr. Masrud from, among other things,  "the use of any Confidential Information and/or Proprietary information of Polysciences and/or disclos[ure] [of] such Confidential Information and/or Proprietary Information to any third party, person, firm, corporation, or other entity for any reason or purpose whatsoever unless Employee first obtains the written consent of Polysciences President."  The Agreement prohibits such conduct during or after the term of the employment.

113.     The Agreement was supported by adequate consideration, namely, an offer of employment from Polysciences to Mr. Masrud, with all attendant salary and benefits.

114.     As described previously, while still employed by Polysciences, Mr. Masrud founded a competing business, Serochem, which Mr. Masrud told Polysciences would not sell products similar to Polysciences PEI products.

115.    Instead, Serochem's first products offered for sale are copies of Polysciences highly valued PEI products, made possible only by Mr. Masrud's use of confidential and proprietary information in violation of the Agreement.

116.    Further, Mr. Masrud, as an employee of Polysciences, was bound by numerous confidentiality agreements with Polysciences' customers that prohibit him from using any of the customers' confidential information, including prohibiting him from using customer confidential information in his new business activities with Serochem, where he is directly competing with Polysciences for the same customers.  Upon information and belief, Mr. Masrud's current activities breach his obligations under confidentiality agreements with Polysciences' customers.

117.    Mr. Masrud failed to return Polysciences documents, which include its trade secrets to Polysciences after his employment ended, in violation of the Confidentiality and Proprietary Agreement.

118.    As a direct result of this breach of contract, Polysciences will incur irreparable harm and damages.

**PRAYER FOR RELIEF**

**WHEREFORE**, Polysciences prays for judgment against Defendant as follows:

A.    Compelling the immediate return of all Polysciences property, confidential business information and trade secrets, including all hard copies and electronic copies in the possession, custody and control of Mr. Masrud his agents, servants, representatives, successors and assigns, and all persons or businesses in active concert or participation with him;

B.      Temporarily, preliminarily and permanently enjoining Mr. Masrud and his agents, servants, representatives, successors and assigns, and all persons or businesses in active concert or participation with him from using or disclosing Polysciences Trade Secrets in the PEI products currently offered for sale by Serochem and enjoining Defendant from the use of Polysciences Trade Secrets to manufacture and sell any other linear polymer PEI products; and ceasing sale of Serochem's PEI Prime Powder and PEI Prime AQ products and discarding all products;

C.      Ordering that discovery shall immediately commence and be conducted on an expedited basis;

D.      Awarding Polysciences its actual damages, the precise amount to be proven at trial;

E.      Awarding Polysciences its attorneys' fees, costs and interest incurred herein; and

F.      For such other and further relief as the Court deems just and proper.

## REQUEST FOR JURY DEMAND

Please take notice that Plaintiff Polysciences demands a jury trial in this matter.

Respectfully submitted,

By:  */s/ Eric E. Reed*
Eric E. Reed
FOX ROTHSCHILD LLP
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2741 - direct
(215) 299-2150 - fax
EReed@foxrothschild.com

*Attorneys for Plaintiff*
*Polysciences, Inc.*

Date: July 27, 2020

## VERIFICATION

I, Andrew Ott, hereby represent that I am Executive Vice President and Chief Operating Officer at Polysciences, Inc., and I am authorized to make this verification on behalf of Polysciences, Inc.  As provided for in 28 U.S.C. § 1746, I verify under penalty of perjury that the facts contained in the foregoing verified complaint are true and correct to the best of my knowledge, information and belief.

POLYSCIENCES, INC.

Dated: July 27, 2020

By: _____
Andrew Ott
Executive Vice President

-27-