**UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

POLYSCIENCES, INC.,

               Plaintiff,

v.

JOSEPH T. MASRUD,

               Defendant.

Case No. 20-cv-03649-PBT

---

**PLAINTIFF POLYSCIENCES, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**

---

**FOX ROTHSCHILD LLP**

Eric E. Reed
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2741 - direct
(215) 299-2150 - fax
EReed@foxrothschild.com

*Attorneys for Plaintiff*
*Polysciences, Inc.*

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................ 1

II.    STATEMENT OF FACTS ................................................................... 4

    A.    Polysciences and its PEI Products ........................................ 4

    B.    Mr. Masrud's Employment at Polysciences ........................11

    C.    Mr. Masrud's Wrongful Behavior .......................................13

III.    ARGUMENT .....................................................................................16

    A.    Likelihood of Success ..........................................................17

        i.    Mr. Masrud has undeniably breached the Confidential and Proprietary Agreement ...............................................................17

        ii.    Mr. Masrud has misappropriated Polysciences' Trade Secrets ...............20

    B.    Irreparable Harm ..................................................................25

    C.    The Balance of Equities ........................................................28

    D.    The Public Interest ...............................................................30

IV.    CONCLUSION ..................................................................................31

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*,
   42 F.3d 1421 (3d Cir. 1994) ...............................................................17

*Amazon.com v. Barnesandnoble.com Inc.*,
   239 F.3d 1343 (Fed. Cir. 2001)..........................................................16

*BIEC In'l, Inc. v. Glob. Steel Servs., Ltd.*, ..........................................21
   791 F. Supp. 489, 545 (E.D. Pa. 1992)

*Bieros v. Nicola*,
   857 F.Supp. 445 (E.D.Pa. 1994) .........................................................16

*Bimbo Bakeries USA, Inc. v. Botticella*,
   613 F.3d 102 (3d Cir. 2010) ...............................................................28

*Cenveo Corp. v. Slater*, Civ. No. 06-cv-2632, 2007 WL 442387 (E.D. Pa. Jan. 31,
   2007) .................................................................................................19

*J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*,
   287 F.3d 267 (3d Cir. 2002) ...............................................................16

*Campbell Soup Co. v. ConAgra, Inc.*,
   977 F. 2d 86 (3d Cir. 1992) ................................................................26

*Celsis In Vitro, Inc. v. CellzDirect, Inc.*,
   664 F.3d 922 (Fed. Cir. 2012)............................................................27

*Cerro Fabricated Products LLC v. Solanick*,
   300 F. Supp. 3d 632 (M.D. Pa. 2018) .................................................26

*Del. Strong Families v. Att'y Gen. of Del.*,
   793 F.3d 304 (3d Cir. 2015) ...............................................................16

*Emergency Care Research Inst. v. Guidant Corp.*,
   No. 06-1898, 2007 WL 2702455 .........................................................20

*EXL Labs., LLC v. Egolf*,
   No. CIV.A.10-6282, 2010 WL 5000835 (E.D. Pa. Dec. 7, 2010)...... 16, 20, 21, 22, 26, 29, 30

*Freedom Med., Inc. v. Whitman*,
   343 F. Supp. 3d, 509, 523 (E.D. Pa. 2018).........................................25

*Fres-co Sys. USA, Inc. v. Hawkins*,
    690 F. App'x 72 (3d Cir. 2017) ..........................................................................23

*Fres-co Sys. USA, Inc. v. Hawkins*,
    No. CV 16-4246, 2016 WL 9306081 (E.D. Pa. Aug. 26, 2016)............................... 16, 23, 28

*Hua v. Lehman XS Tr. Mortg. Pass-Through Certificates, Series 2007-7N*,
    No. CV 17-1457, 2017 WL 4240911 (E.D. Pa. Sept. 25, 2017) ...........................................17

*Hybritech, Inc. v. Abbott Labs.*,
    849 F.2d 1446 (Fed.Cir.1988)......................................................................... 16, 30

*Jazz Pharm., Inc. v. Synchrony Grp., LLC*,
    343 F. Supp. 3d 434 (E.D. Pa. 2018)............................................................. 20, 23, 25, 27

*Keystone Driller Co. v. Gen. Excavator Co.*,
    290 U.S. 240 (1933) ......................................................................................28

*Lawman Armor Corp. v. Winner Intern., Inc.*,
    No. Civ. A. 01-1605, 2002 WL 123342 (E.D. Pa. Jan. 28, 2002) ...................................29, 31

*MarbleLife, Inc. v. Stone Res., Inc.*,
    759 F. Supp. 2d 552 (E.D. Pa. 2010)...................................................................30

*Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*,
    69 Fed.Appx. 550 (3d Cir. 2003) .......................................................................17

*Nevro Corp. v. Stimwave Technologies, Inc.*,
    1-19-cv-00325-CFC (D. Del, 2019-07-24, Order)..............................................................27

*O.D. Anderson, Inc. v. Cricks*,
    815 A.2d 1063 (Pa. Super. Ct. 2003) ................................................................22

*Oburn v. Shapp*,
    521 F.2d 142 (3d Cir. 1975) ............................................................................17

*Payless Shoesource, Inc. v. Reebok Intern., Ltd.*,
    998 F. 2d 985 (Fed. Cir. 2005)...................................................................29, 31

*Prison Health Servs., Inc. v. Umar*,
    No. CIV.A. 02-2642, 2002 WL 32254510 (E.D. Pa. July 2, 2002)......................................31

*S & R Corp. v. Jiffy Lube Int'l, Inc.*,
    968 F.2d 371 (3d Cir. 1992) ..............................................................................28

*SI Handling Sys., Inc. v. Heisley*,
    753 F.2d 1244 (3d Cir. 1985)............................................................................19

*Solar Innovations, Inc. v. Plevyak,*
  No. 1110 MDA 2002, 2013 WL 11272840 (Pa. Sup. Ct. March 20, 2013)..........................18

**Statutes**

12 Pa. Cons. Stat. Ann. § 5302 ....................................................................................20

12 Pa. Cons. Stat. Ann. § 5503(a)................................................................................20

18 U.S.C. § 1836(b)(3)(A) ...........................................................................................20

Pennsylvania Uniform Trade Secrets Act ...................................................................20

Defend Trade Secrets Act.............................................................................................20

**Other Authorities**

Federal Rule of Civil Procedure 65..............................................................................16

## MEMORANDUM OF LAW

Plaintiff Polysciences, Inc. ("Polysciences") by and through its undersigned counsel, hereby submits this brief in support of its Motion for a Temporary Restraining Order and Preliminary Injunction against Defendant Joseph T. Masrud ("Mr. Masrud").

## I.      INTRODUCTION

Polysciences brings this action to stop the misappropriation of its valuable trade secrets and the resultant irreparable harm to its business caused by the actions of its former employee, Mr. Masrud.  Polysciences is one of only three commercial entities that has consistently demonstrated the ability to provide quality Polyethylenimine ("PEI") transfection reagents for the research, development and commercial supply of biological treatments for humans.  Declaration of Leena Mol Thuruthippallil, Ph.D. ("Thuruthippallil Decl.") at ¶ 6.  Broadly speaking, transfection is the process of introducing nucleic acids (DNA and RNA) into cells utilizing by means other than viral infection, to study the function of genes or gene products by enhancing or inhibiting specific gene expression in cells, and to produce recombinant proteins in mammalian cells.  Thuruthippallil Decl. at ¶ 3.

While transfection has been around for decades, it is a highly technical process that presents numerous technical challenges and options.  PEI is a particularly useful transfection reagent.  Although PEI has been used as a transfection reagent for a couple of decades, Polysciences and its competitors have spent most of this period perfecting their respective PEI product offerings.  The resultant respective products are distinct, with unique methods of manufacture, compositions, and performance characteristics.  Moreover, in order to achieve consistently high quality and high performing PEI products to meet the demand of the customers, Polysciences developed, over years and at great costs, unique, confidential, and proprietary recipes, production procedures, and quality control procedures to acquire its market share and hard earned reputation for high quality products.

1

Clearly, PEI products *are not* mere fungible commodities.  In fact, high end PEI products can sell for prices ranging up to ten thousand to a hundred thousand dollars for a gram of the highest quality products.  Declaration of Andrew Ott in Support of Motion for a Temporary Restraining Order ("Ott. Decl.") at ¶ 5.  Today, Polysciences PEI products are its most profitable and fastest growing products in its Laboratory Products division.  Ott. Decl. at ¶ 6.

Mr. Masrud joined Polysciences in January of 2014 with no background in the industry or with PEI products in particular. As a condition of employment, Mr. Masrud executed upon joining the company a Confidentiality and Proprietary Agreement in which he agreed, *inter alia*, to "not, *during or after the term of employment with Polysciences*, use any Confidential Information and/or Proprietary Information of Polysciences and/or disclose such Confidential Information and/or Proprietary Information to any third party, person, firm, corporation, or other entity for any reason or purpose whatsoever unless Employee first obtains the written consent of Polysciences' President."  Docket Entry 1, Verified Complaint ("Complaint") at ¶ 33, Exhibit 2 (emphasis added).  Mr. Masrud advanced from a marketing position to become director of Polysciences Lab Products division in September 2016 with responsibility, among other things, for the PEI product line.  In fact, from 2015 to 2019 Mr. Masrud had responsibility in particular for developing Polysciences' two newest PEI products, which both had to meet the FDA's cGMP (current Good Manufacturing Practices) requirements.  This four-year product development effort was a key strategic focus of Mr. Masrud and the company during his tenure with Polysciences and Polysciences spent approximately $600,000 in out of pocket costs with third parties and countless internal hours developing these new products.

In or about January of 2019, Mr. Masrud advised Polysciences that he and his family intended to move back to Minnesota, their native state, in the summer of 2019 and he officially

left the company as an employee on June 26, 2019.  Complaint ¶ 44, 60.  Prior to leaving employment in June, Mr. Masrud and Polysciences discussed Mr. Masrud working as a consultant to Polysciences and his future business plans.  Notably, during these discussions Mr. Masrud indicated his desire to become a consultant in the industry and possibly start a biological services company, but he emphasized that his plans did not include selling any products that competed with or were similar to Polysciences products.  As a result of these conversations, Mr. Masrud was retained as a consultant by Polysciences working on, among other things, sales of PEI, until the consultancy was terminated by Polysciences on or about September 6, 2019.  Complaint ¶ 61.

Approximately ten months after the end of his relationship with Polysciences, Mr. Masrud's company, Serochem, a company he had created as a sole proprietorship for consulting with Polysciences in June of 2019 while still employed by Polysciences, launched its first two commercial products--PEI Prime Powder and PEI Prime AQ.  These products are direct competitors with, and indeed copycats, of Polysciences two most profitable and fastest growing Lab Division products.  More to the point, it is utterly impossible that Mr. Masrud launched these two products without using the Polysciences trade secrets and confidential information Mr. Masrud learned as an employee of Polysciences and expressly agreed not to disclose or use during or after his employment.  Indeed, the mere fact he selected the two most profitable and fastest growing products to copy further reveals that he was using confidential Polysciences information to launch his business.  Moreover, he launched these products in mere *months* after leaving Polysciences, while it took Polysciences (and its legitimate competitors) *years* to develop each of its PEI product offerings.

There is simply no way that Mr. Masrud, a sole proprietor with limited financial means, achieved this rapid launch of these two particular products without using his knowledge of PEI

trade secrets, which include, among other things, key ingredient sourcing information, product specifications, customer lists and pricing, and manufacturing processes and procedures. Indeed, as discussed more below, his lawyer's response, in which Mr. Masrud refused to agree to Polysciences' demand that he cease and desist, demonstrates that he has priced his product based upon his knowledge of Polysciences' secret pricing strategy and has positioned his product essentially as a replacement for Polysciences' product. Again, he was only able to achieve this because of his knowledge learned during his time at Polysciences, which includes how the Polysciences product is made. Accordingly, Polysciences brings this action to preliminarily and permanently enjoin Mr. Masrud and those acting in concert with him from using Polysciences' trade secrets and specifically using those trade secrets to offer for sale and sell the PEI Prime Powder and PEI Prime AQ products.

## II.      STATEMENT OF FACTS

### A.      Polysciences and its PEI Products

For almost 60 years, Polysciences has been a trusted and well-respected manufacturer of high-purity monomer and polymers products for the scientific community. Ott. Decl. at ¶ 3. Polysciences' collection of small- to mid-scale manufacturing processing and packaging equipment allows it to handle a broad array of products that are widely used for many scientific applications and to enhance critical characteristics. Ott. Decl. at ¶ 3. Polysciences' operations use FDA and cGMP (current Good Manufacturing Practices) compliant blending and packaging equipment for its proprietary production and for use in custom operations for other parties. Complaint at ¶¶ 13-20.

PEI has many uses and has been used in academic circles for decades in biological research. Thuruthippallil at ¶ 6. Over the last twenty-five years or so, PEI has become a leading transfection reagent. Ott. Decl. at ¶ 5. Transfection is the process of introducing nucleic acids (DNA and

RNA) into cells utilizing means other than viral infection, to study the function of genes or gene products. Thuruthippallil at ¶ 3. PEI works by condensing DNA into positively charged particles, which bind to anionic (negative charged) cell surface residues, which are then brought into the cell. Thuruthippallil at ¶ 4. Common transfection techniques include chemical, lipid, and electroporation. Thuruthippallil at ¶ 4. Chemical methods neutralize the negative charge of DNA, facilitating its uptake, and electroporation makes the membrane more permeable transiently, allowing DNA to enter the cell. Thuruthippallil at ¶ 4. Chemicals like PEI, a cationic (positively charged) polymer whose linear form has been described as the most efficient to transfect a wide range of cell lines and thus is broadly used in transient gene expression, which makes it easier for the DNA transfection reagent complex to cross the cell membrane. Thuruthippallil at ¶ 4. Occasional changes in the genetic makeup of cultured cells allow them to proliferate indefinitely, making them effectively immortal. Thuruthippallil at ¶ 5. In short, PEI transfection is a way to deliver DNA to a cell for experiments with gene expression and ultimately to develop gene therapies, which are a fast growing area of medical science. *See* Thuruthippallil at ¶¶ 4-6.

PEI itself can come in different forms (solid and liquid of varying concentrations) and configurations, including branched chained polymers and straight chains, and can be comprised of different molecular weight polymers. Thuruthippallil at ¶ 7. Likewise there are a multitude of ways in which PEI products can be produced, resulting in a multitude of PEI products of varying quality and efficiencies with respect to different applications or uses. Thuruthippallil at ¶ 7. Thus, there are many types of PEI products, each of which requires careful design and development to produce a product of consistent quality and performance. Thuruthippallil at ¶ 7. Polysciences, for instance, sells PEI products made from either branch chained and straight chain polymers, made from polymers of different molecular weight, provided in powder or liquid form, and cGMP and

5

non cGMP versions.  Thuruthippallil at ¶ 7.  Polysciences has spent over 15 years and millions of dollars in the aggregate developing these various PEI products, each of which can in turn be customized to some extent for client purposes.  Thuruthippallil at ¶ 7.

The customers for PEI transfection agents are highly demanding, requiring high quality products to successfully perform their expensive and complex laboratory and commercial production processes.  Ott. Decl. at ¶¶ 6-7; Complaint at ¶ 73.  Consequently, there are in fact only a few companies that have proven over the years that they can provide PEI transfection agents of consistently high quality to meet the customers needs.  Thuruthippallil at ¶ 6.  These companies are Polysciences, Sigma-Aldrich, and Polyplus-transfection all of whom are substantial commercial entities that have spent years, if not decades investing in the development of their PEI products.  Complaint at ¶ 23.  Because of the exacting standards required for the performance of PEI products and the years of development required to produce PEI products of consistent quality and performance, PEI transfection agents can sell for very high prices ranging up to ten thousand to a hundred thousand dollars for a gram of the highest quality products.  Ott. Decl. at ¶ 5.

Over years of effort, research, development and dedicated customer service Polysciences has established a reputation for its high quality PEI products, that are currently used as a transient transfection reagent (where the introduced material is only present in the cell for a limited amount of time and never incorporated into the genome) for many researchers and companies to gain a critical edge in their work.  Ott. Decl. at ¶ 6.  Polysciences PEI products are particularly known for their high efficiency as transfection reagents and their low cytotoxicity.  Thuruthippallil at ¶ 10.   PEI is generally cytotoxic, i.e. it tends to kill cells, which defeats the purpose of the transfection the clients are preforming.  Thuruthippallil at ¶¶ 10-14. Polysciences, however, has

distinguished itself in the market by its ability to develop PEI transfection reagents with consistently low cytotoxicity.  Thuruthippallil at ¶¶ 10-14.

Polysciences also provides a GMP ("Good Manufacturing Practices") transfection reagent, in both powder and aqueous form, which functions as a cGMP transfection reagent for the development and manufacturing of viral vectors for cell-and gene-based therapies.  Complaint at ¶¶ 3, 15.  Polysciences' solution — MAXgene™ GMP Transfection Reagent — and as a powder — MAXgene™ GMP Transfection reagent, Powder capitalizes on the efficiency and scalability of Polysciences' PEI MAX, while adding the validation process and regulatory components necessary for moving into clinical and commercial manufacturing.  Ott. Decl. at ¶ 7.  Polysciences manufactures its MAXgene products in accordance with cGMP under an ISO 13485 Quality Management System.  Complaint at ¶¶ 18, 30.

Polysciences' reputation and success with its PEI products emanates from its extremely high standards, quality control, and commitment to excellence and its customers.  Ott. Decl. at ¶ 6; Complaint at ¶ 18.   Its quality control and assurance programs include: ISO 13485:2016 Certification; Food and Drug Administration Registration; and Certification to SOCMA's ChemStewards® Management System.  Complaint at ¶ 18.  Polysciences' invaluable trade secrets are the core of Polysciences' success with its PEI products.   These trade secrets enable Polysciences to manufacture its high performing and high quality PEI products, are difficult to imitate or substitute, and therefore give Polysciences a strong competitive position.  Ott. Decl. at ¶ 6; Complaint at ¶ 28.

The Polysciences PEI trade secrets include the following types of information: step-by-step, detailed manufacturing instructions outlining raw materials, process parameters, and other procedures to synthesize the PEI, prepare the solution, and package the materials; design of the

PEI chemistry, including molecular weight, molecular structure, product form, and process and compounds used to create the desired pH of the solution; key raw material supplier data and specifications; internal sourcing of novel and rare supply materials; internal test methods to determine key material characteristics; identification and selection of third party laboratories for testing of sterility, mycoplasma, heavy metals and endotoxin; identification and selection of third party testing partners to determine transfection efficiency, expression, and cell viability; selection of specific sterile filtering process to avoid techniques that could adversely impact polymer properties; strategy to pursue development for improved solubility; the neutralization process and compounds used to produce the desired pH; customer lists and contacts, product pricing, costs, margins, competitive strategy, and sales history for top PEI products and future forecasts; and receipt of confidential information from customers for specific product-related projects (the "Polysciences Trade Secrets").  Complaint at ¶ 4.  Polysciences protects its trade secrets by among other things:

a.      maintaining and updating employee manual and practices that require employees to protect all confidential information and requiring employees to acknowledge receipt and understanding of these policies and procedures.

b.      requiring as a condition of employment that all employees (including Mr. Masrud) execute agreements to keep confidential all of Polysciences proprietary confidential information.  These agreements specifically prohibit, among other things, employees from using or disclosing Polysciences' Confidential information and from misappropriating Polysciences' Proprietary information during or after the term of the employment;

c.      limiting access to the Polysciences Trade Secrets to only a few Polysciences senior employees, which is achieved by giving only these select employees access to the files on

the Polysciences server and securing a singular hard copy of design files containing certain Trade Secret information in a quality assurance managers file cabinet;

d.       monitoring Polysciences' employees compliance with its confidentiality requirements and upon identification of violations of Polysciences' Confidentiality & Proprietary Agreement, taking prompt steps to correct the issue, including remedial actions with the employees involved; and

e.       entering into appropriate confidentiality agreements with Polysciences customers, suppliers and other business partners to protect both Polysciences and the partner's valuable proprietary information.

Complaint at ¶ 32. Thus, Polysciences has specific precautions put in place to prevent the disclosure of the Polysciences Trade Secrets including anyone not requiring access to the information. Complaint at ¶ 32.

Beginning in 2015, Polysciences started marketing PEI as a transfection reagent focusing on two linear PEI products of different molecular weight, Linear PEI MW 25,000 (PN 23966) was released first, followed by PEI Max, MW 40,000 HCl salt (PN 24765). Complaint at ¶¶ 35-36. PEI MAX was also offered in a ready to use version (i.e. dilute liquid) under the "Transporter" mark. Complaint at ¶¶ 35-36. Specifically, the Polysciences non-GMP transfection products sales have grown substantially since 2015, increasing almost eight fold from 2015 until today. Complaint at ¶ 37.

Polysciences also launched in 2015 a project to manufacture GMP certified PEI transfection agents to take advantage of huge market potential Polysciences foresaw. Complaint at ¶ 38. This project took four years and was eventually completed by Polysciences in September 2019. Complaint at ¶ 38-39. This project required meticulous development of manufacturing

processes and product specifications based on the existing product line, including in many cases trial and error to determine the preferred industrial scale product manufacturing and supply processes and details, as well as the preferred product recipe. Ott. Decl. at ¶ 8. Polysciences expended approximately $600,000 in out of pocket costs and countless internal hours on this GMP project alone. Complaint at ¶ 40. The return on this investment in the GMP project is driven by Polysciences' less expensive non-GMP (PEI Max) product, which is the product customers generally purchase in the research and development phase of the clients product development. Ott. Decl. at ¶ 9. When the customer's product progresses to clinical trials commercial scale, the customer then needs to purchase large quantities of cGMP PEI reagent so that the customer's end product can meet FDA cGMP requirements. Ott. Decl. at ¶ 9. Polysciences' solution — MAXgene™ GMP Transfection Reagent — and as a powder — MAXgene™ GMP Transfection, Powder capitalizes on the efficiency and scalability of Polysciences' PEI MAX, while adding the validation process and regulatory components necessary for moving into clinical and commercial manufacturing. *See* Thuruthippallil at ¶ 14.

The MAXgene products are manufactured in accordance with cGMP under an ISO 13485 Quality Management System. Complaint at ¶¶ 29-30. The MAXgene cGMP products are based on Polysciences' trade secret processes for the PEI Max products developed over many years before and were scaled up for a cGMP product. Ott. Decl. at ¶ 10. Thus, the cGMP product essentially doubles down on the core of the Polysciences Trade Secrets to produce a highly valuable product line extension. Ott. Decl. at ¶ 10. With the addition of these cGMP products, Polysciences PEI product sales tripled from 2018 to 2019, and in 2020, are expected to more than triple. Ott. Decl. at ¶ 10; Complaint at ¶ 58. All of this explosive growth has been driven by

Polysciences' years of development of the Polysciences Trade Secrets, which allow it to produce PEI products of unique quality and performance.  Ott. Decl. at ¶ 10.

  **B.**  **Mr. Masrud's Employment at Polysciences**

  Mr. Masrud was a full-time employee at Polysciences from January 6, 2014, until June 26, 2019.  Complaint at ¶ 44.  As a condition of his employment, Mr. Masrud executed a Confidentiality & Proprietary Agreement on January 5, 2014, the day before he started work, which amongst other provisions, prohibited him from using or disclosing Polysciences' Confidential information and from misappropriating Polysciences' Work Product during or after the term of the employment.  Complaint at ¶ 47. While an employee, Mr. Masrud held three different roles: Lab Products Business Development Manager, Lab Products Business Manager, and Director of Lab Products, the last of which position he assumed in September 2016.  Complaint at ¶ 45.

  Mr. Masrud had no prior experience with PEI transfection reagents before working at Polysciences.  Complaint at ¶ 51.  Instead**,** Mr. Masrud learned about PEI products while working at Polysciences.  Complaint at ¶ 51.  Beginning in 2015, Mr. Masrud began promoting Polysciences' powder PEI products for transfection, and subsequently worked on the development of the aqueous form of the Polysciences' PEI products.  Complaint at ¶ 53.  This required Mr. Masrud to have access to the Polysciences Trade Secrets.  Complaint at ¶¶ 55-57.  With the exception of a hard copy binder securely maintained by the quality assurance manager, the Polysciences Trade Secrets are only accessible on Polysciences' secure server, for which one had to both have a password and be given special permission to access.  Complaint at ¶ 32.  Mr. Masrud was one of only a few employees privy to the Polysciences Trade Secrets.  *See* Complaint at ¶ 32.

  Mr. Masrud's positons required his personal involvement in Polysciences development of the cGMP product line, a project for which he had lead management responsibility from September 2016 once he became Director of the Lab Products Group.  Complaint at ¶¶ 55-57.  Thus, he had intimate

knowledge of, and participated in key decisions with respect to the trade secrets Polysciences developed in the creation of its cGMP products form its existing PEI transfection reagent product line. Complaint at ¶¶ 52-53, 55-57.  Further, Mr. Masrud witnessed the almost immediate success of the cGMP PEI products with sales of PEI products tripling from 2018 to 2019 and expected to triple again from 2019 to 2020.  Complaint at ¶ 58.  Polysciences' long-term investment in PEI was one of the most significant products ever added to the business unit.  Complaint at ¶ 59.  Mr. Masrud well knew prior to leaving Polysciences, the Polysciences PEI products have become the fastest growing and the most profitable products of Polysciences Lab Group with anticipated continued huge growth. Complaint at ¶¶ 58-59.

Throughout his time at Polysciences, Mr. Masrud was responsible for sales of PEI products, including managing key accounts, and engaging new customers. Ott. Decl. at ¶ 11.  Further, as Director of Lab Products, Mr. Masrud was personally responsible for developing market and customer specific pricing strategies, all of which were treated as closely held trade secrets by Polysciences.  Ott. Decl. at ¶ 11.  In or around January 2019, Mr. Masrud told Andrew Ott, Polysciences Executive Vice President and Chief Operating Officer, that he was leaving Polysciences to relocate to Minnesota where his wife had accepted a job.  Complaint at ¶ 60; Ott. Decl. at ¶ 12.  Mr. Masrud told Mr. Ott that he would be forming a company, Serochem, but he assured Mr. Ott that he would not pursue or sell competing PEI related products with his new company.  Complaint at ¶ 61; Ott. Decl. at ¶ 12.  Rather he claimed he was interested in developing a consulting business and perhaps some downstream biological service products that were entirely different from what Polysciences sold.  Complaint at ¶ 61; Ott. Decl. at ¶ 12.  Upon leaving his employment, and given Mr. Masrud's assurances, Polysciences allowed Mr. Masrud to stay on as an independent contractor for Polysciences from July 2019 to September 2019, to assist in onboarding his successor and assist in business development.  Complaint at ¶ 62.

12

### C.      Mr. Masrud's Wrongful Behavior

Mr. Masrud formed Serochem LLC on June 5, 2019, while he was still employed by Polysciences, ostensibly to be a legal shell for him to perform consulting services.  *See* Complaint at ¶ 11.  Shortly thereafter, while working as a consultant for Polysciences, Mr. Masrud stole from Polysciences at least one document containing highly confidential and valuable trade secret information.  Complaint at ¶ 62.  For example, on August 20, 2019, Mr. Masrud sent from his work email account, to his personal email account, a document titled "Polysciences PEI Quality Guide" which compared Polysciences' specifications for non-GMP powder, non-GMP solution, and GMP solution.  Complaint at ¶ 62; Ott. Decl. at ¶ 14.  This document was prepared by Mr. Masrud himself for his quick reference to key product specifications and quality processes.  Ott. Decl. at ¶ 14.  The document itself is a unique compilation of data that Polysciences has maintained as trade secret and further includes specific information that is itself trade secret, such as details of the heavy metal limits and key quality aspects of the compared products.  Ott. Decl. at ¶ 14.  These specifications are of course directly relevant to the non-GMP powder and solutions Mr. Masrud is now selling through Serochem, less than a year later.  Ott. Decl. at ¶ 14.  On September 6, 2019, Polysciences fired Mr. Masrud after he became increasingly difficult to work with and withheld basic business development and accounting management information from Polysciences, including customer names, customer contact information and pricing strategies.  Ott. Decl. at ¶ 13.

Polysciences has scrutinized the Serochem website regularly since it first appeared. Complaint at ¶ 64.  Contrary to Mr. Masrud's prior assurances, Serochem has begun offering copycats of Polysciences two most successful products.  Complaint at ¶ 65.  On July 7, 2020, Serochem began offering for sale the first two products on its website, PEI Prime™ Powder, Transfection Grade Linear Polyethylenimine and PEI Prime™ AQ 1 mg/mL Liquid Transfection Reagent, which appear to be copycats of Polysciences' highly valued PEI Max and Transporter 5

products.  Complaint at ¶¶ 65-66; Thuruthippallil Decl. at ¶ 15.  On the Serochem website, PEI Prime™ is compared to popular transfection-grade PEI, including Polysciences PEI products. Complaint at ¶ 67; Thuruthippallil Decl. at ¶ 16.  Indeed, his website attached an article titled "Comparative study of polyethylenimines for transient gene expression in mammalian HEK293 and CHO cells" that specifically references the superior performance of Polysciences' PEI Max product.  Complaint at ¶ 67.  Note, after receiving Polysciences' Cease and Desist letter from counsel for Polysciences, this article, which expressly referenced Polysciences' Products, was removed from the Serochem website.  Complaint at ¶ 68.

Furthermore, a comparison of the protocols, product specifications and performance indicates high similarity between Polysciences's and Serochem's transient transfection reagents, such as Transporter™ 5 (Polysciences) and PEI Prime (Serochem), which cannot be coincidental. Thuruthippallil Decl. at ¶ 15.  For example, the protocol of Suspension Cell Culture Transient Transfection with PEI Prime (Serochem) uses: 1) the exact same mixing order of the reagents for transient transfection (DNA – PEI – cells); 2) the same DNA concentration (100 µg DNA per 100 ml or 1 µg/ml); 3) the same PEI starting concentration (1 mg/ml); and 4) similar cell density as specified in the "Protocol For Suspension Cells" using Polysciences's Transporter™ 5. Thuruthippallil Decl. at ¶ 15.  Similar to what Polysciences recommends to customers regarding its PEI Max product, Serochem also recommends not to freeze the PEI Prime solution formulated from the powder and to store it at 4°C for 6 months.  Thuruthippallil Decl. at ¶ 15.  This is because PEI MAX forms precipitates upon a freeze-thaw process, which could adversely affect the transfection efficiency of the product.  Thuruthippallil Decl. at ¶ 15.  Because Serochem has unlikely had enough time to do a product stability study, it is nearly impossible for Serochem to

make this recommendation without using the Polysciences Trade Secrets.  Thuruthippallil Decl. at ¶ 15.

Of the approximately 2,000 products under Mr. Masrud's control as the Director of Lab Products at Polysciences, he chose to offer copycats of the two most profitable products with the highest growth potential after starting Serochem.  Ott. Decl. at ¶ 15.  Furthermore, Mr. Masrud, as president of Serochem, with seemingly very limited resources, was able to develop, manufacture, and bring to market these two PEI products within less than a year after his departure from Polysciences compared to the years Polysciences, a far more substantial and resourced organization, has spent on developing its PEI products.  Ott. Decl. at ¶ 15.

Accordingly, on July 8, 2020, Fox Rothschild LLP, representing Polysciences, sent Mr. Masrud c/o Serochem a Cease and Desist letter demanding that they stop selling the PEI based transient transfection reagents that Mr. Masrud obviously developed using the trade secret and confidential information Mr. Masrud acquired while working for Polysciences.  Complaint at ¶ 69. This letter also reminded Mr. Masrud of his post-employment confidentiality obligations to Polysciences, which prohibit, among other things, the misappropriation of trade secrets. Complaint at ¶ 69.  Mr. Masrud responded through his attorney refusing to cease and desist in the sale of his copycat products, reciting a litany of standard defenses raised by defendants in trade secret cases without any substantiation.  Complaint at ¶ 70.  Significantly, the letter omitted any mention of Mr. Masrud sending to himself and retaining the Polysciences Trade Secrets. Complaint at ¶¶ 70-71.  However, the letter readily acknowledged that Mr. Masrud had deliberately undercut Polysciences' pricing for its PEI products, something he could have only done with use of Polysciences' trade secret pricing.  Complaint at ¶¶ 70, 74.  Thus, this was a tacit

acknowledgment that Mr. Masrud's product launch was in fact guided by and based upon his intimate knowledge of Polysciences trade secrets. *See* Complaint at ¶¶ 70-71.

## III.   ARGUMENT

The grant of a temporary restraining order is an equitable remedy ordered to maintain the status quo while the court has a chance to explore the mertis of the case. *See EXL Labs., LLC v. Egolf*, No. CIV.A.10-6282, 2010 WL 5000835, at *3 (E.D. Pa. Dec. 7, 2010); *see also J.O. ex rel. C.O. v. Orange Twp. Bd. of Educ.*, 287 F.3d 267, 273 (3d Cir. 2002) (stating that a temporary restraining order is "analogous to a stay-put order").   "The standard for granting a temporary restraining order under Federal Rule of Civil Procedure 65 is the same as that for issuing a preliminary injunction." *EXL Labs.*, 2010 WL 5000835, at *3 (citing *Bieros v. Nicola*, 857 F.Supp. 445, 446 (E.D.Pa. 1994)).   In deciding whether to grant a temporary restraining order, the court considers whether: "(1) Plaintiff has demonstrated a likelihood of success on the merits; (2) Plaintiff will be irreparably harmed by the denial of injunctive relief; (3) the balance of harms favors Plaintiff; and (4) the public interest favors granting the injunction." *Fres-co Sys. USA, Inc. v. Hawkins*, No. CV 16-4246, 2016 WL 9306081, at *2, n.1 (E.D. Pa. Aug. 26, 2016) (citing *Del. Strong Families v. Att'y Gen. of Del.*, 793 F.3d 304, 308 (3d Cir. 2015)).[1]   These factors, taken individually, are not dispositive; rather, the district court must weigh and measure each factor against the other factors and against the form and magnitude of the relief requested. *Amazon.com v. Barnesandnoble.com Inc.,* 239 F.3d 1343, 1350 (Fed. Cir. 2001) (quoting *Hybritech, Inc. v. Abbott Labs.*, 849 F.2d 1446, 1451 (Fed.Cir.1988)); *see also Neo Gen Screening, Inc. v. TeleChem Int'l, Inc.*, 69 Fed.Appx. 550, 554 (3d Cir. 2003) ("As a court sitting in equity, the District Court's

---

[1] The Court considers the same four factors in weighing requests for preliminary injunctive relief. *See Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharm. Co.*, 290 F.3d 578, 586 (3rd Cir. 2002) (citations omitted).

task was to weigh the four factors, but it was not incumbent on [the plaintiff] to prevail on all four factors, only on the overall need for an injunction.  A sufficiently strong showing on either the likelihood of success or irreparable harm may justify an injunction, though a petitioner's showing on the other factors may be lacking.").

Here, each of the above factors weighs in favor of a temporary restraining order, and fully justifies the scope of the requested relief.  A detailed discussion of each factor follows.

A.     **Likelihood of Success**

i.     *Mr. Masrud has undeniably breached the Confidential and Proprietary Agreement*

In order to properly state a claim for breach of contract under Pennsylvania law, one must show, "(1) the existence of a contract, including its essential terms, (2) a breach of a duty imposed by the contract and (3) resultant damages."  *Hua v. Lehman XS Tr. Mortg. Pass-Through Certificates, Series 2007-7N*, No. CV 17-1457, 2017 WL 4240911, at *7 (E.D. Pa. Sept. 25, 2017). One only needs to show "a reasonable probability that it will prevail on the merits," to meet its burden.  *Oburn v. Shapp*, 521 F.2d 142, 148 (3d Cir. 1975), holding modified by *Am. Tel. & Tel. Co. v. Winback & Conserve Program, Inc.*, 42 F.3d 1421 (3d Cir. 1994).

This factor weighs overwhelmingly in favor of Polysciences, as it is undeniable that Mr. Masrud is in breach of contract.  Mr. Masrud signed a Confidentiality & Proprietary Agreement on January 5, 2014 ( the "CPA"), which prohibited him from using or disclosing Polysciences' Confidential information and from misappropriating Polysciences' Work Product during or after the term of the employment and further required Mr. Masrud to return Polysciences' confidential information.  Complaint at ¶ 33.  As noted above, on August 20, 2019, Mr. Masrud emailed himself the Polysciences PEI Quality Guide, and he never returned said document that he surreptitiously removed from Polysciences.  Complaint at ¶¶ 62-63.  Instead, Mr. Masrud chose to wrongfully

17

keep this confidential trade secret information that happens to be directly relevant to the products he choose to launch to jump-start his competing business.  His breach of the agreement is thus beyond dispute.

In addition to breaching his obligation to return Polysciences' confidential information, it is also clear that Mr. Masrud has used Polysciences trade secrets in breach of the CPA.  Mr. Masrud had intimate knowledge of Polysciences' PEI pricing and was directly involved in the decisions regarding same; a strategy and approach that was one of Polysciences' closest held and most valuable secrets.  Yet in responding to Polysciences' Cease and Desist letter, Mr. Masrud's lawyer states that one of the key reasons for why Mr. Masrud is offering his PEI products at such a low price is because Mr. Masrud believed Polysciences' PEI products were overpriced.  *See, e.g.*, Complaint at ¶ 70.  Similarly, Mr. Masrud's lawyer contends, on Mr. Masrud's behalf, that there are differences in Mr. Masrud's PEI products.  *See* Complaint at ¶ 71.  True or not (and Polysciences believes it is not true as discussed below), this again demonstrates the development and sale of Mr. Masrud's PEI products was guided by and influenced by Mr. Masrud's knowledge of the Polysciences' confidential information relating to its PEI products, specifically regarding the methods of production and composition of the PEI products.  Simply knowing what not to do and how to design around a product produced by trade secrets is itself a use of the trade secrets to create the new product.  *See Solar Innovations, Inc. v. Plevyak*, No. 1110 MDA 2002, 2013 WL 11272840, at * 10 (Pa. Sup. Ct. March 20, 2013) (stating that knowledge of successful and unsuccessful design strategies and components of a product, and using such knowledge to create a new product, constitutes protected trade secrets) (citing *SI Handling Sys., Inc. v. Heisley*, 753 F.2d 1244, 1261 (3d Cir. 1985)).

Evidence of Mr. Masrud's use of Polysciences' highly confidential information, and thus breach of the CPA, does not end there, however.  Mr. Masrud also consciously decided to launch, as his first two and *only* products, products that happen to compete with the most profitable and fastest growing Polysciences' products.  *See* Complaint at ¶ 58.  Mr. Masrud's PEI products were also directly compared on his website, where he Mr. Masrud also suggested his products were at least as good as the highly regarded Polysciences PEI products he choose to copy.  *See* Complaint at ¶ 67; *see also* Thuruthippallil Decl. at ¶ 16.  Further, Mr. Masrud launched these products after telling Polysciences he would not sell competing products in his new business.

Mr. Masrud choice of which products to launch is no accident, but in fact was clearly informed by his knowledge of the Polysciences' confidential information.  Further, the fact that he was able to launch these products in a matter of mere months raises additional red flags.  Although Mr. Masrud alleges that he developed and launched his PEI products based solely upon his own research, even if he did do some of his own research, the quickness and ease with which it was accomplished could only be achieved from spring boarding off the confidential information Polysciences had painstakingly developed at considerable cost and over many years of effort.

In sum, it is beyond dispute that Mr. Masrud wrongfully kept Polysciences' proprietary and highly confidential documents in breach of the CPA and further used Polysciences' confidential information (in breach of the CPA) as a spring board to launch within months his PEI products.  Therefore, the Court should grant Polysciences' request for expedited discovery, including allowing Polysciences to obtain mirror or digital images of the hard drives of Mr. Masrud's personal computers, so Polysciences' can ascertain the true extent in which Mr. Masrud wrongfully kept Polysciences' proprietary and highly confidential information in breach of the CPA.  *See, e.g.*, *Cenveo Corp. v. Slater*, Civ. No. 06-cv-2632, 2007 WL 442387, at *2-*3 (E.D.

19

Pa. Jan. 31, 2007).  Further, as expressly noted in the CPA, "immediate and irreparable damage will result to Polysciences [from Masrud's] breaches … of the terms of [the CPA]."  Complaint at ¶¶ 48-49.  Thus, given the indisputable breaches of the CPA and the acknowledged irreparable harm to Polysciences, the Court should grant Polysciences' request for a temporary restraining order as well as its request for a preliminary and permanent injunction.

<h3 style="text-align:center">ii.    *Mr. Masrud has misappropriated Polysciences' Trade Secrets*</h3>

Under the Defend Trade Secrets Act ("DTSA") and the Pennsylvania Uniform Trade Secrets Act ("PUTSA") "misappropriation of trade secrets includes the acquisition of a trade secret of another by a person who knows or has reason to know that the trade secret was acquired by improper means or the disclosure or use of a trade secret of another without express or implied consent."  *Jazz Pharm., Inc. v. Synchrony Grp., LLC*, 343 F. Supp. 3d 434, 445 (E.D. Pa. 2018) (internal citations and quotations omitted).  Furthermore, the "DTSA and the PUTSA permit a court to enjoin permanently either (1) actual or (2) threatened misappropriation of trade secrets." *Id*. (citing 18 U.S.C. § 1836(b)(3)(A); 12 Pa. Cons. Stat. Ann. § 5503(a)).  When deciding whether information is considered a trade secret, the courts in this district weigh the following factors:

> (1) the extent to which the information is known outside of the owner's business; (2) the extent to which it is known by employees and others involved in the owner's business; (3) the extent of measures taken by the owner to guard the secrecy of the information; (4) the value of the information to the owner and to his competitors; (5) the amount of effort or money expended by the owner in developing the information; and (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*EXL Labs., LLC*, 2010 WL 5000835, at *5 (quoting *Emergency Care Research Inst. v. Guidant Corp*., No. 06-1898, 2007 WL 2702455, at *5).  Further, the PUTSA specifically includes information such as "formula, drawing, pattern, compilation including a customer list, program, device, method, technique, or process," as protectable trade secrets.  12 Pa. Cons. Stat. Ann. § 5302.

As with its breach of contract claims, Polysciences' likelihood of success on misappropriation of trade secrets is extremely high.  The record shows that  Polysciences has built, over years of effort and at considerable cost, a body of Trade Secrets around its PEI products that have caused these products to become Polysciences' most profitable and fastest growing products; *i.e.* the Polysciences Trade Secrets are the basis for the success of PEI products.  For instance, Polysciences has developed and maintained confidentially precise protocols, business development plans, customer lists, and pricing data, which provides Polysciences a competitive advantage in the marketplace has proven by Polysciences success.  Ott. Decl. at ¶ 6; *see also EXL Labs.*, 2010 WL 5000835, at *5 (stating chemical composition specifications, "Pricing Data, Dealer Programs, LOL Program and its business development plans," are all "information [] typical of that which trade secret law seeks to protect."); *BIEC In''l, Inc. v. Glob. Steel Servs.*, Ltd., 791 F. Supp. 489, 545 (E.D. Pa. 1992) ("Similar protection has been extended to certain business and marketing information including the costing and pricing information of an employer's product or services, an employer's business plans, marketing strategies, and financial projections, and the terms of specific customer accounts including contract expiration dates and revenues generated.").

The record also shows that Polysciences has instituted procedures to protect the Polysciences Trade Secrets, including:  requiring a password and license (which only a very few had) to access the Trade Secret; requiring employees, including Mr. Masrud, to sign Confidentiality & Proprietary Agreements, in which one must agree to not use Polysciences Trade Secrets beyond the scope of one's employment and to protect the Polysciences Trade Secrets and requiring employees to read and acknowledge policies and  procedures instructing them about their obligations of confidentiality and monitoring compliance therewith, including reminding employees of the requirements.  Complaint at ¶ 32.  Indeed, Mr. Masrud acknowledged in writing

21

at least twice the confidentially policies and procedures during his employment, in addition to signing the CPA and being reminded in writing about his obligations thereunder upon his departure.  Polysciences has established it took appropriate precautions to maintain its Trade Secrets.[2]  Complaint at ¶ 34.

Having established the existence of its Trade Secrets, the only issue to demonstrate likelihood of success on the merits is whether Polysciences has demonstrated Mr. Masrud has misappropriated Trade Secrets in some fashion.  As noted above, however, there can be no dispute that Mr. Masrud improperly acquired and failed to return the Polysciences PEI Quality Guide, which is itself a trade secret and also contains specific trade secret information about Polysciences' PEI Products.  Hence, there is more than a likelihood of success of demonstrating misappropriation of trade secrets as it is an established fact.

Mr. Masrud's misappropriation of trade secrets, however, is far more systematic and deeper than just the theft of the Polysciences PEI Quality Guide.  In fact, Mr. Masrud has misappropriated and used extensively the bulk of the Polysciences Trade Secrets to launch his business in record time.  Indeed, he could not have launched his business without relying extensively on the Polysciences Trade Secrets.  The record shows that Mr. Masrud had no prior knowledge of PEI products before joining Polysciences.  Complaint at ¶ 51.  In his positons at Polysciences, he had access to all of Polysciences PEI Trade Secrets and in fact was a leading member of the Polysciences development team that identified key product features for the PEI transfection product offerings including the PEI chemistry, molecular weight, linear structure, quality

---

[2] Polysciences further note that while Polysciences has used its commercially reasonable efforts to maintain the Polysciences Trade Secrets as secret, only "substantial secrecy" is required, not "absolute secrecy," which Polysciences has demonstrated here.  *EXL Labs., LLC*, 2010 WL 5000835, at *5 (citing *O.D. Anderson, Inc. v. Cricks*, 815 A.2d 1063, 1070 (Pa. Super. Ct. 2003)).

procedures, formulation steps and he personally lead customer pricing, product market placement and other strategic sales and marketing activities. Complaint at ¶¶ 52-57. In short, Mr. Masrud's entire knowledge of the PEI products comes from his work at Polysciences. It is frankly impossible that Mr. Masrud somehow launched these highly technical and specialized PEI products without accessing his in depth knowledge of the Polysciences Trade Secrets, which have made Polysciences' PEI products a success. Thus, the moment Mr. Masrud decided to launch the look alike Serochem PEI products, it became inevitable that Mr. Masrud necessarily would use and/or disclose the Polysciences Trade Secrets.

The Third Circuit has held that "where an employee's work for a new employer substantially overlaps with work for a former employer, based on the same role, industry, and geographic region, a district court may conclude that those employees would likely use confidential information to the former employer's detriment." *Jazz Pharm., Inc. v. Synchrony Grp.*, LLC, 343 F. Supp. 3d 434, 446 (E.D. Pa. 2018); *see also Fres-co Sys. USA, Inc. v. Hawkins*, 690 F. App'x 72, 76 (3d Cir. 2017) (stating that this principle applies causes of actions brought under both the DTSA and PUTSA). Such is the case here. Mr. Masurd has launched highly technical look alike products to Polysciences' two most profitable products that Mr. Masrud was personally managing just months before he set out to copy the products. Mr. Masrud does not know just *some* of the Trade Secrets relating to Polysciences' PEI products, he knows them **all** of the Polysciences Trade Secrets. And in fact, he was the keeper of the secrets while at Polysciences. Mr. Masrud's launch of the copycat or look alike products at Serochem necessarily requires him to use his "specialized and confidential knowledge to the detriment" of Polysciences. *Fres-co Sys. USA*, 2016 WL 9306081, at *2, n.1 (stating that by working as a sales representative for many years, the defendant had access to the company's "confidential information, including customer

lists, price lists, and marketing and sale strategies," which he would "likely disclose and/or use" upon starting a similar position at a competing company and would cause "immediate irreparable harm"). However, Mr. Masrud did exactly that; he used the information learned during his employment at Polysciences to sell, through interstate commerce, copycat PEI products on the Serochem website.

Although as noted above it is inevitable that Mr. Masrud would use and/or disclose the Polysciences Trade Secrets to sell his copycat products, there is also substantial evidence that he has done so, whether or not it was inevitable. As noted above, this evidence includes, without limitation:

- Sending to himself and keeping the Polysciences PEI Quality Guide;

- His decision to launch copycat products to the two most profitable and fastest growing products of the 2000 products of Polysciences Lab Products division he directed;

- The striking similarity of the products themselves, including molecular weight, straight chain polymer, powder and ready to use form and other specifications;

- The direct comparisons he has made between the quality and performance of his Serochem products and Polysciences PEI products;

- The similarity between the protocols set forth on the Serochem website and Polysciences protocols (*see generally* Thuruthippallil Decl.);

- His admitted strategy of pricing below what he knows is the Polysciences pricing strategy;

- Assuring Polysciences he would not sell similar products and then months later selling copycat products; and

24

- The speed with which the products were launched after leaving Polysciences.

In closing, it is much more than likely that Polysciences will prevail on the merits of its misappropriation of trade secret claims—indeed, it is inevitable under the circumstances here. There is simply no way that Mr. Masrud did not use the Polysciences Trade Secrets. Mr. Masrud was only able to develop and bring to market (a process that normally takes several years) its PEI products in about a year because of Mr. Masrud's wrongful misappropriation of the Polysciences Trade Secrets. Mr. Masrud was intimately familiar with the years of research and development conducted by Polysciences to develop its high quality PEI Products. Thus, Mr. Masrud was able to short cut Serochem's developmental process for its own PEI Products because Masrud knew what, and more importantly what ***not*** to do. Thus, only with the use of the Polysciences' Trade Secrets, was Mr. Masrud was able to take a multi-year process and achieve the same results within a matter of months.[3]

### B.     Irreparable Harm

The damages that Polysciences will suffer as a result of Mr. Masrud's breach of contract and misappropriation of the Polysciences Trade Secrets are not readily subject to calculation or compensable with money damages. Mr. Masrud has acted to steal and use in competition the core of Polysciences' business. Polysciences will suffer irreparable harm if Mr. Masrud is not enjoined from misappropriating the Polysciences Trade Secrets. Mr. Masrud has in fact stipulated to this in the CPA. Further, Courts have acknowledged that the misappropriation of a Trade Secret by

---

[3] Further, to the extent Mr. Masrud claims that Serochem's PEI products are substantially different from Polysciences' PEI Products, this too proves that Mr. Masrud wrongfully misappropriated the Polysciences Trade Secrets as Mr. Masrud used this valuable and proprietary information to specifically design around the Polysciences PEI Products.

and of itself causes irreparable harm. *Freedom Med., Inc. v. Whitman*, 343 F. Supp. 3d, 509, 523 (E.D. Pa. 2018) ("[T]he Third Circuit has stated that 'an intention to make imminent or continued use of a trade secret or to disclose it to a competitor will almost certainly show immediate irreparable harm.'") (citing *Campbell Soup Co. v. ConAgra, Inc.*, 977 F. 2d 86, 92-93 (3d Cir. 1992)); *Cerro Fabricated Products LLC v. Solanick*, 300 F. Supp. 3d 632, 645 (M.D. Pa. 2018) (stating that the use of a trade secret demonstrates irreparable harm that "cannot be measured in money because a trade secret once lost is, of course, lost forever.") (internal citations omitted).

Mr. Masrud's conduct, himself and acting through Serochem, threatens to destroy Polysciences' PEI Product business, or at least destroy its as of yet undetermined growth potential. The threat is twofold: first Serochem has used its knowledge of Polysciences' pricing strategy to undercut and destroy Polysciences' hard earned brand value; second, Serochem's copycat product, which has the same molecular weight, same straight chain polymer, same HCl based derivatization, same filtering etc., threatens to destroy the high quality reputation of Polysciences' specific PEI transfection reagents by presenting as a comparable alternative at much lower cost and presumably lower quality. Serochem's aggressive pricing (which does not need to support Polysciences research and development efforts) will likely quickly erode Polysciences' competitive position and prevent Polysciences from achieving the growth it otherwise would have achieved. Thus, the placement of Serochem's PEI products on its website represents an inevitable loss of market share and access to potential customers by Polysciences. These facts alone call for a finding of irreparable harm. *See, e.g.*, *EXL Labs., LLC*, 2010 WL 5000835, at *7 ("Plaintiff's would be at a significant competitive disadvantage in the market place. We agree that it would be very difficult if not impossible to ascertain what portion of Plaintiff's loss in sales is attributable to the misappropriated information. The harm would be irreparable.").

Further, it should be noted that the non-GMP products that Polysciences sells, and Serochem is now trying to copy, are a lead-in product to the sale of GMP products. Mr. Masrud knows of the exponential success Polysciences has seen with its cGMP PEI products, and undoubtedly, his strategy is to emulate Polysciences here as well. Thus, it is highly likely that Mr. Masrud will use his non-GMP products as a lead into developing and selling a GMP PEI Product, which he will again inevitably develop using what he learned from Polysciences and incorporate the Polysciences Trade Secrets into his PEI GMP product. Thus, the irreparable harm being created is in fact the destruction of Polysciences' **entire** PEI product line, which inherently includes threatened harm from the launch of additional Serochem copycat products. *See, e.g.*, *Jazz Pharm., Inc.*, 343 F. Supp. 3d at 446 (holding that one's access to confidential information and failure to assure that same would be treated as secret, "plausibly suggests the threatened misappropriation of [the] trade secrets.").

Also, it is likely that Polysciences will suffer harm to its brand recognition, goodwill, and reputation resulting from the introduction of Serochem's PEI products. Polysciences places a heavy emphasis on the quality of its products and strict testing procedures, which are critical to Polysciences' business considering that these factors are what set Polysciences' products apart from its competitors. Polysciences has made significant inroads over its competition by establishing a reputation for providing high-quality products that meet high-levels of testing. Because of Serochem's ability to price its PEI products at a fraction of the price of Polysciences' PEI products, Polysciences believes that its testing procedures and product quality are superior to those of Serochem. It follows, therefore, that Polysciences will suffer irreparable harm, in the form of loss of goodwill, damage to its hard-earned reputation, and loss of prospective business opportunities as the copycat Serochem PEI products gain market share and begin generating

27

negative customer impressions relating to product quality. *Celsis In Vitro, Inc. v. CellzDirect, Inc.*, 664 F.3d 922, 930 (Fed. Cir. 2012) (". . . loss of goodwill, damage to reputation, and loss of business opportunities are all valid grounds for finding irreparable harm") (additional citations omitted); *Nevro Corp. v. Stimwave Technologies, Inc.*, 1-19-cv-00325-CFC (D. Del, 2019-07-24, Order) (Plaintiff's motion for a preliminary injunction to prohibit the sales of defendant's spinal cord stimulation product granted in part, because plaintiff established that it would suffer harm to reputation resulting from confusion between an inferior accused product and plaintiff's superior product absent an injunction); *S & R Corp. v. Jiffy Lube Int'l, Inc.*, 968 F.2d 371, 378 (3d Cir. 1992) ("Grounds for irreparable injury include loss of control of reputation, loss of trade, and loss of goodwill.").

Furthermore, "[i]nterference with customer relationships is similarly recognized to cause harm that is unascertainable and not capable of being fully compensated by money damages." *Fres-co Sys. USA, Inc. v. Hawkins*, No. CV 16-4246, 2016 WL 9306081, at *2 (E.D. Pa. Aug. 26, 2016). Here, Mr. Masrud's actions have the potential to interfere and deprive Polysciences of actual and potential customers. Thus, the resulting damages to Polysciences caused by the distribution of the Serochem's PEI products likely will increase over time due to the loss of repeat business, and the loss of references to other potential customers. For these additional reasons, Polysciences' potential losses are incalculable, and Polysciences will suffer irreparable harm if a temporary restraining order is not granted.

### C.     The Balance of Equities

The balance of equities tips overwhelmingly in favor of Polysciences: first because Mr. Masrud is so clearly in the wrong here (*see Bimbo Bakeries USA, Inc. v. Botticella*, 613 F.3d 102, 118-19 (3d Cir. 2010) (stating that where the facts demonstrate that the restriction is necessary to prevent greater irreparable harm from befalling another party, the equities weigh in favor of issuing

a preliminary injunction); *Keystone Driller Co. v. Gen. Excavator Co.*, 290 U.S. 240, 245 (1933) (stating that the equitable powers of a court do not favor those who have acted fraudulently or, by unfair means, gain an advantage)); second because the hardship to Polysciences that will result from a denial of a temporary restraining order will far outweigh any hardship to Mr. Masrud if the temporary restraining order is granted.  The key point here is that Mr. Masrud's products have been on the market for merely days, and as such have not yet had any material effect on the market. By issuing a restraining order, his market entry, in the unlikely event he somehow prevails in this matter, is merely delayed, but his ultimate potential success in the market remains unchanged.  He is essentially an unknown entity with no brand equity today.  There is no criticality to the date of his launch.  If Mr. Masrud's product remains on the market long enough to make a material impact on customers, on the other hand, it will immeasurably impact Polysciences brand equity and growth potential because it will have created doubt in the market place about Polysciences pricing and quality proposition.  The subsequent removal of Mr. Masrud's products would not eliminate the doubt created by Mr. Masrud's continued sale of his PEI products at drastically lower prices for any extended period of time and thus, will inevitably harm the reputation and goodwill/brand equity that Polysciences has built over years of efforts, customer service, and providing a high quality PEI product.  *Payless Shoesource, Inc. v. Reebok Intern., Ltd.*, 998 F. 2d 985, 989 (Fed. Cir. 2005) (finding that post-sale confusion, where the consumer attributes the inferior quality of the knockoff product to that of the superior product, damages the superior company's reputation and image);  *Lawman Armor Corp. v. Winner Intern., Inc.*, No. Civ. A. 01-1605, 2002 WL 123342, at * 19 (E.D. Pa. Jan. 28, 2002) (finding that the equities weighed in the favor of the non-infringer because it invested millions in product development and promotion, while the infringer spent money on an attorney to avoid infringement of the original product).

In sum, preventing Mr. Masrud from using the Polysciences Trade Secrets would effectively maintain the status quo prior to his launch of the offending product and would not result in any irreparable or greater harm to him. *See EXL Labs., LLC*, 2010 WL 5000835, at *7 (E.D. Pa. Dec. 7, 2010) ("We similarly find that granting injunctive relief will not result in even greater harm to Defendants. Our issuance of a preliminary injunction will maintain the status quo by simply prohibiting Defendants' from using Plaintiff's proprietary information."). To the extent Masrud's launch is delayed, any damages that he may have will be covered by an appropriate bond that Polysciences will provide.

### D.   The Public Interest

"[T]he public interest favors enforcing valid contracts and making parties live up to their agreements." *MarbleLife, Inc. v. Stone Res., Inc.*, 759 F. Supp. 2d 552, 563 (E.D. Pa. 2010). It is undeniable that Mr. Masrud had a legal obligation to not use Polysciences confidential information and return to Polysciences any confidential documents upon termination of his employment. However, Mr. Masrud chose to keep and apparently use these valuable documents, thereby violating his Proprietary and Confidentiality Agreement. The public interest is also best served by protecting trade secrets that are likely to be found valid and misappropriated. *See, e.g.*, *EXL Labs.*, 2010 WL 5000835, at *7 (holding that "injunctive relief is in the public interest in that it will deter Defendants and others from misappropriating trade secrets, a practice which stifles, rather than promotes, competition."). As discussed above, Mr. Masrud clearly misappropriated the Polysciences Trade Secrets to develop and bring to market Serochem's PEI products, which are currently sold on Serochem's website. Because Polysciences owns the established Polysciences Trade Secrets and took adequate measures to maintain the confidentiality of same, it is highly likely that Mr. Masrud will be found to have wrongfully misappropriated the Polysciences Trade Secrets. Also, there is no critical public interest that would be injured by the grant of injunctive

relief.  *See, e.g.*, *Hybritech Inc. v. Abbott Labs.*, 849 F.2d 1446, 1458 (Fed. Cir. 1988).  In fact, although Mr. Masrud may want to argue that Serochem's lower price point of its product better serves the public interest, he would be mistaken.  Courts have routinely held to the contrary since "copiers universally price their products lower than innovators."  *See, e.g.*, *Payless Shoesource, Inc. v. Reebok Int'l Ltd*., 998 F.2d 985, 991 (Fed. Cir. 1993); *cf Lawman Armor Corp. v. Winner Int'l, Inc*., No. CIV.A. 01-1605, 2002 WL 123342, at *20 (E.D. Pa. Jan. 28, 2002), *aff'd*, 50 F. App'x 427 (Fed. Cir. 2002) (holding that "the fact that an infringer is selling a lower-priced product does not justify allowing it to infringe valid patent rights"); *Prison Health Servs., Inc. v. Umar*, No. CIV.A. 02-2642, 2002 WL 32254510, at *18 (E.D. Pa. July 2, 2002) (stating that the court could not "conclude that the public interest in obtaining the lowest possible price for such contracts outweighs the well recognized interest in enforcing covenants not to compete").  The public interest factor, therefore, favors granting the temporary restraining order.

## IV.    CONCLUSION

Mr. Masrud has breached his Proprietary & Confidentiality Agreement with Polysciences by wrongfully keeping and using Polysciences confidential information that was required to be return upon termination of his employment with Polysciences.   Mr. Masrud has also misappropriated the Polysciences Trade Secrets and is selling products, through his company Serochem, that incorporate same for his own benefit and without the express or implied consent of Polysciences.  It is also highly probable that Mr. Masrud will continue to misappropriate the Polysciences Trade Secrets to develop a cGMP form of Serochem's PEI products.  There is a very high likelihood, therefore, that Mr. Masrud will not only be found to have wrongfully misappropriated the Polysciences Trade Secrets, but that threatened future misappropriation of the Polysciences Trade Secrets exists.  Polysciences will suffer substantial and irreparable harm if Mr. Masrud is not immediately ordered to cease his wrongful activities.  Mr. Masrud, on the other

hand, will undergo little if any hardship if this temporary restraining order is granted.  No critical public interests will be adversely affected by the temporary restraining order, and the public interest will be served by the protection of valid trade secrets.  Because all four of the factors to be considered in determining whether a temporary restraining order should issue weigh overwhelmingly in favor of issuance, Polysciences respectfully requests that the Court preserve the status quo as it was prior to the start of Mr. Masrud's wrongful activities by granting Polysciences' Motion for a Temporary Restraining Order.

Respectfully Submitted,

**FOX ROTHSCHILD LLP**

Dated: July 28, 2020

*/s/ Eric E. Reed*
Eric E. Reed
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2741 - direct
(215) 299-2150 - fax
EReed@foxrothschild.com

*Attorneys for Plaintiff*
*Polysciences, Inc.*