**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| POLYSCIENCES, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:20-cv-03649-PBT |
| | : | |
| v. | : | |
| | : | |
| JOSEPH T. MASRUD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**DEFENDANT JOSEPH T. MASRUD'S MEMORANDUM OF LAW IN OPPOSITION**
**TO PLAINTIFF POLYSCIENCES, INC.'S MOTION FOR**
**<u>TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION</u>**

On the Brief:

Julianne L. Peck, Esq.

HOMANSPECK, LLC
43 Paoli Plaza #426
Paoli, PA  19301
(215) 868-6214
jpeck@homanspeck.com
*Attorneys for Defendant*

August 27, 2020

# Table of Contents

I.    INTRODUCTION .................................................................................................1

II.   FACTUAL BACKGROUND .................................................................................2

    A. NO CONFIDENTIAL INFORMATION IS REQUIRED TO MANUFACTURE PEI
       TRANSFECTION REAGENT PRODUCTS. ...................................................................2

    B. POLYSCIENCES HIRED MR. MASRUD IN JANUARY, 2014, SHORTLY
       BEFORE THE EXPIRATION OF THE USE PATENT THAT PERMITTED
       POLYSCIENCES TO MARKET AND SELL ITS INDUSTRIAL PEI PRODUCTS
       AS A TRANSFECTION REAGENT. .........................................................................4

    C. MR. MASRUD'S EMPLOYMENT WITH POLYSCIENCES ENDED EFFECTIVE
       JUNE 26, 2019, AND HE BECAME A CONSULTANT FOR POLYSCIENCES ON
       JULY 2, 2019. ................................................................................................4

    D. SEROCHEM, INC. DEVELOPED ITS OWN PEI PRODUCTS WITHOUT USING
       ANY  CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS.......................5

    E. SEROCHEM DID NOT USE POLYSCIENCES' CONFIDENTIAL INFORMATION
       OR MISAPPROPRIATE ANY TRADE SECRETS. ........................................................5

    F. MR. MASRUD DID NOT "TAKE" OR "USE" THE "PEI QUALITY GUIDE" THAT
       HE EMAILED TO HIS PERSONAL EMAIL ADDRESS DURING HIS
       CONSULTANCY WITH POLYSCIENCES. ...................................................................7

    G. POLYSCIENCES HAS BROUGHT THIS ACTION IN BAD FAITH. ............................8

III.  ARGUMENT ......................................................................................................10

    A. THE STANDARD TO OBTAIN INJUNCTIVE RELIEF IS HIGH AND
       POLYSCIENCES CANNOT MEET IT...........................................................................10

    B. POLYSCIENCES HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS
       ON THE MERITS.....................................................................................................11

    C. POLYSCIENCES CANNOT DEMONSTRATE IRREPARABLE HARM. ..................14

    D. THE EQUITIES AND PUBLIC INTEREST CLEARLY TILT IN MASRUD'S
       FAVOR. .................................................................................................................18

IV.   CONCLUSION ..................................................................................................19

# TABLE OF AUTHORITIES

## CASES

*Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994) .................................................. 18

*All. Life Scis. Consulting Grp., Inc. v. Fabriczi* ....................................................................... 15

*Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992) .................................... 15

*Capital Bakers v. Townsend*, 426 Pa. 188, 192, 231 A.2d 292-4 (1967) ...................................... 12

*Checker Cab Phila., Inc. v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 26471, at *6-7
    (E.D. Pa. March 3, 2015) ...................................................................................................... 11

*Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir.1980) ............. 16, 18

*ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987) ..................................................... 18

*Ferring Pharms., Inc. v. Watson Pharms., Inc.*, 765 F.3d 205, 210 (3d Cir. 2014) ...................... 11

*Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) ........... 15

*Freedom Med., Inc. v. Whitman*, 343 F. Supp. 3d 509, 523 (E.D. Pa. 2018) ............................... 15

*Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994) ............................................................... 11

*Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (Pa. 2002) ............................................................... 19

*Instant Air Freight Co. v. C.F. Air Freight Inc.*, 882 F.2d 797, 800 (3d Cir. 1989) ..................... 10

*Marblelife, Inc. v. Stone Resources, Inc.*, 759 F. Supp. 2d 552, 562 (E.D. Pa. 2010) ................. 15

*Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) ....................................................................... 10

*Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*,
    290 F.3d 578, 596 (3d Cir. 2002) ......................................................................................... 18

*Profit Point Tax Technologies, Inc. v. DPAD Group, LLP*, 2020 WL 759952, at *5 (W.D. Pa.
    Jan. 29, 2020) ...................................................................................................................... 11

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) ............................................................................... 18

*Synvgy, Inc. v. ZS Assocs, Inc.*, C.A. No. 07-3536, 2013 WL 3716518 at *2 (E.D. Pa. July 15,
    2013) ..................................................................................................................................... 12

*Vector Sec., Inc. v. Stewart, 88 F. Supp. 2d 395, 401 (E.D. Pa. 2000)* ....................................... 19

*Vital State Canada, LTD. v. DREAMPAK, LLC*, 303 F. Supp. 2d 516, 527 (D.N.J. 2003) .......... 14

Defendant Joseph T. Masrud ("Masrud"), through his undersigned counsel, respectfully submits this Memorandum of Law in Opposition to the Motion for Temporary Restraining Order and Preliminary Injunction ("Motion") filed by Plaintiff Polysciences, Inc. ("Polysciences").

## I.     INTRODUCTION

Polysciences is neither likely to succeed on the merits of its claims against Masrud, nor will it be irreparably harmed should a preliminary injunction not issue. Polysciences' entire case is premised on its theory that Masrud – ***who notably is not subject to any non-competition covenant*** – should be prevented from operating a competing business because Polysciences posits on information and belief that it would be impossible for Masrud to develop a competing business, Serochem, without relying on its confidential information. In doing so, Polysciences fails to inform the Court that the information needed to make Serochem's products is publicly available and anyone could find the information needed from a number of sources, including Polysciences' own website. Thus, there is absolutely no merit to Polysciences' claims that Masrud misappropriated confidential information and trade secrets, and Masrud will readily establish this without extensive discovery, simply by showing the publicly available information that he used to develop the two products at the heart of this case.

Polysciences also cannot establish the other required elements for the extraordinary relief sought in its Motion. First, Polysciences cannot demonstrate irreparable harm if Masrud is permitted to continue to operate Serochem and sell the two products at issue, as any alleged injury to Polysciences can be remedied by easily identified monetary damages. Moreover, the equities and the public interest both support denial of the requested injunction.  Polysciences brought this action in bad faith in a backdoor attempt to quash competition, and there can be no doubt it will suffer far less if the injunction is denied than Masrud will if the injunction is

granted.  Polysciences has been in business over 60 years and sells over 2,000 products.

Serochem has sold under $600 of product to date after Masrud spent a significant portion of his

life savings to develop only 2 competing products.  Driving him out of business based on

speculation and absent a full and fair opportunity for Masrud to defend this action will

undoubtedly cause him significant irreparable injury.

## II.    FACTUAL BACKGROUND

### A.    NO CONFIDENTIAL INFORMATION IS REQUIRED TO MANUFACTURE PEI TRANSFECTION REAGENT PRODUCTS.

Polysciences is a chemical manufacturing company that produces and sells a broad array

of products for both industrial and scientific uses.  One of its products is Polyethylenimine

("PEI"), which is a chemical polymer that has been used for decades for many industrial uses

such as detergents, adhesives, water treatment agents, and cosmetics.  Declaration of Joseph T.

Masrud (attached hereto as **Exhibit "1"**), ¶ 5.   PEI can also be used in bioprocessing as a

chemical transfection reagent.  When used as a transfection reagent, PEI facilitates insertion of

DNA into cells to study the function of genes or gene products and is used to develop new drugs

and gene therapies for life-saving medical procedures.  *Id.* ¶ 8.

From July 1995 through July 2015, there was a US and European patent in place, limiting

the use of PEI as a transfection reagent.  **Exhibit "2"** (https://www.tebu-bio.com/blog/2015/07/02/pei-transfection-patents-to-expire/); *See also*, Masrud Decl. ¶ 7;.

However, as noted in the 2015 article attached hereto as Exhibit "2," many academic researchers

shared protocols online and published articles explaining how cost-effective and simple PEI

transfection can be.

Contrary to Polysciences' assertion that it would be impossible to manufacture a PEI

transfection reagent in a matter of months without using alleged confidential and/or proprietary

information, instructions to make PEI have been in the public domain since as early as 1983.  By way of example only, 10 public sources for instructions are attached to Masrud's Declaration at Exhibits "A" – "J."   The instructions are simple.  Mix three ingredients -- Pol(2-ethyl-2-oxazoline) ("PEOx"), water, and hydrochloric acid ("HCl") -- in specified amounts and heat the mixture to near boiling for at least several hours, which forms a wet mixture of PEI, HCl, and water.  *Id.* ¶¶ 12-14.[1]  You then remove residual acid and water from the wet PEI mixture and are left with PEI powder.  *Id.* ¶ 14.  All of this can be accomplished using standard equipment.  *Id.* ¶ 15.  Time, temperature, and concentration of water and acid can be tweaked until you reach the desired results.  In the chemical field, making PEI transfection reagent is akin to baking a simple cake made with only a few ingredients, and tweaking the process (temperature, cook time, wetness) until you achieve the texture and taste of your preference.

According to Polysciences, it has been manufacturing and selling PEI products for over 15 years.  Thus it manufactured and sold PEI prior to the expiration of the PEI transfection reagent use patent.  *Id.* ¶¶ 7, 16-17.   The products Polysciences has long sold include (1) Linear PEI MW 25,000 (PN23966) and (2) PEI MAX®, MW 40,000 HCl salt (PN 24765) ("PEI Max"), both of which are a powder that can be used for either industrial or transfection purposes.  *Id.* ¶ 16.  To use PEI as a transfection reagent, it must be in liquid form.  Because PEI Max dissolves easier in water it is more suitable as a transfection reagent.  *Id.*

Once the use patent expired in 2015, Polysciences marketed PEI specifically for transfection and offered customers the option to buy it in powder form (PEI Max/Linear PEI) or

---

[1] Sources to purchase PEOx are also identified in publications that discuss making PEI transfection reagent.  *Id.* ¶ 13.

a "ready to use" liquid form (Transporter 5 Transfection Reagent 5 ml (PN 26008-5) and (2) Transporter 5 Transfection Reagent 50 ml (PN 26008-50)). *Id.* ¶ 18.

Polysciences has accused Mr. Masrud of "copycatting" its PEI Max and Transporter 5 products, and suggests that the process of transforming the PEI powders into liquid form is a trade secret. Once again, however, Polysciences never treated it as such, and the instructions for this process are readily available in the public domain. Throughout Mr. Masrud's tenure with Polysciences, it readily gave instructions about converting PEI powder into a liquid to current and prospective customers in the event that the customers preferred to buy the less expensive powder and transform it themselves into a liquid. *Id.* ¶ 19. Polysciences also makes these instructions available on its own website for that purpose. *Id.* In addition, these instructions are contained in various third-party publications. *Id.* ¶ 20.

B.    **POLYSCIENCES HIRED MR. MASRUD IN JANUARY, 2014, SHORTLY BEFORE THE EXPIRATION OF THE USE PATENT THAT PERMITTED POLYSCIENCES TO MARKET AND SELL ITS INDUSTRIAL PEI PRODUCTS AS A TRANSFECTION REAGENT.**

Mr. Masrud has a B.S. in Chemistry and an MBA. *Id.* ¶ 3. Polysciences hired him in January 2014, as a Business Development Manager in its Lab Products Group. *Id.* ¶ 4. It subsequently promoted him to Business Manager, and then to Director. In these roles he was responsible for marketing and ensuring sales of Polysciences' laboratory productions, including PEI. *Id.*

C.    **MR. MASRUD'S EMPLOYMENT WITH POLYSCIENCES ENDED EFFECTIVE JUNE 26, 2019, AND HE BECAME A CONSULTANT FOR POLYSCIENCES ON JULY 2, 2019.**

In late June 2019, after giving Polysciences approximately 6 months notice, Mr. Masrud resigned effective June 26, 2019, to move from Philadelphia (where Polysciences is based) to Minnesota, to be closer to family. *Id.* ¶ 24. On July 1, 2019, Polysciences hired him, through his

newly formed company Serochem LLC to continue to work for Polysciences as a consultant.  *Id.* ¶ 25.  Mr. Masrud had formed Serochem both to consult for Polysciences and to potentially develop bioprocessing products and services that he could sell through Polysciences.  *Id.* ¶ 26. Neither Mr. Masrud nor Serochem agreed to be bound to any restrictive covenants as a result of this consulting arrangement.  On September 6, 2019, Polysciences terminated Mr. Masrud's consulting services.  *Id.* ¶ 31.

### D.   SEROCHEM, INC. DEVELOPED ITS OWN PEI PRODUCTS WITHOUT USING ANY  CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS.

Once Polysciences terminated its consulting agreement with Mr. Masrud, Serochem began the process of researching and developing its own PEI transfection products in powder (PEI Prime Powder) and liquid form (PEI Prime AQ).  *Id.* ¶ 33.   Serochem launched these products in June 2020. *Id.* ¶ 35.   These products compete only with Polysciences' PEI Max and Transformer 5 products, and other similar products sold by other competitors.[2]

### E.   SEROCHEM DID NOT USE POLYSCIENCES' CONFIDENTIAL INFORMATION OR MISAPPROPRIATE ANY TRADE SECRETS.

Serochem used only publicly available information and general chemistry knowledge in the development of its competing non-GMP products.  *Id.* ¶ 34.  Mr. Masrud has a Bachelor of Science in chemistry, and Serochem engaged other individuals as needed to assist in its product development efforts.

The fact that Serochem's products may share similarities with Polysciences' products does not mean that Serochem used Polysciences' confidential or proprietary information. Rather, the similarities between the businesses' products  suggests that both companies used similar publicly available information to manufacture their products.  The likelihood of this

---

[2] At least 3 other companies sell PEI transfection products.

scenario is high given that the recipe for PEI transfection powder is simple, Polysciences did not invent PEI transfection, Polysciences never owned a patent on the product (a competitor did); and Polysciences had access to similar publicly available instructions for making a PEI transfection reagent, to which Serochem also had access in 2019, and to which everyone else who tried to work around the use patent while it was in place was arguably using. *See, e.g.,* Masrud Decl. at Exhibits "A" (dated 1983); Exhibit "E" (dated 2001); Exhibit "D" (dated 2003); Exhibit "H" (dated 2007); Exhibit "F" (dated 2010); Exhibits "G" and "J" dated 2012). *See also*, Exhibit "2" (noting in 2015 that "many academic researchers have been ignoring [the US and European patents] and/or have been sharing protocols on-line and publishing articles explaining how cost-effective and simple PEI-mediated transfection can be.").

Polysciences first demanded that Serochem immediately cease and desist from the sale of its recently launched PEI products by letter dated July 8, 2020.  **Exhibit "3."**  The only specific reason provided in that letter for Polysciences' assumption that Serochem's products are a "knock off" is that Serochem described the products as "sterile filtered" and "pH neutralized." Polysciences appears to have since dropped this argument, but only after Mr. Masrud pointed out in his July 16, 2020 response (attached hereto as **Exhibit "4"**) that sterile filtration and pH neutralization are common general chemistry and biology terms, and appear in many academic publications as well as its own website in conjunction with transfection.

Polysciences continues to grasp at straws in support of its Motion.  For example, it now asks the court to assume that Serochem has misappropriated its storage recommendations because both companies recommend storing their respective aqueous PEI products at 4° C and not to freeze them.  Serochem does not make this recommendation (as Polysciences implies) as a result of some alleged proprietary "product stability study."  *See* Declaration of Leena Mol

Thuruthippallil at ¶ 15.  Rather, 4° C is the industry standard for refrigeration.  *Id.* ¶ 38.  The recommendation to refrigerate and not to freeze it, is also not proprietary.  It is standard industry knowledge that freezing aqueous solutions of polymers is bad practice because it can damage the polymer and permanently modify the molecular weight.  In addition, many academic publications explicitly state that Polysciences' PEI Max solutions should be refrigerated, not frozen, and Polysciences published these very recommendations itself on its website!  *Id.*

Finally, Polysciences suggests throughout its motion that Mr. Masrud is using unidentified confidential pricing information.  However, Polysciences publishes the prices for its PEI Max and Transporter 5 products and always has.  *Id.* ¶ 21.   As is evidenced from Polysciences' very own public documents, the price for one gram of PEI Max rose from $345 to $1,035 between May 2019 and August 2020, while the price for 5 mL of Transporter 5 rose from $95 to $285 and the price for 50 mL of Transporter 5 rose from $495 to $1,185 between December 2018 and August 2020.  *Id.*

F.     **MR. MASRUD DID NOT "TAKE" OR "USE" THE "PEI QUALITY GUIDE" THAT HE EMAILED TO HIS PERSONAL EMAIL ADDRESS DURING HIS CONSULTANCY WITH POLYSCIENCES.**

After presumably conducting a forensic review following its cease and desist letter, Polysciences cited in its brief to only one document that Mr. Masrud allegedly "stole:" a PEI Quality Guide that Polysciences claims includes specific trade secret information and reflects a unique completion of data that it has maintained as a trade secret.  A litigation copy of this Guide is attached hereto as **Exhibit "4"** and is being filed under seal.

Mr. Masrud emailed the "Polysciences PEI Quality Guide" ("Guide") to himself on August 20, 2019, when he was a consultant working remotely for Polysciences, to make edits to the document from his home computer.  *Id.* ¶ 27.   That Guide was created as a marketing tool for existing and potential customers to help them decide which PEI product to select for their

7

purposes.  The guide compared certain product specifications for PEI Max, Transport 5, and the

Polysciences MAXgene GMP product (which is not relevant to this litigation given that

Serochem is not selling a GMP product).  It is obvious on the face of the document that it does

not contain any information that would have given Mr. Masrud a competitive advantage in

manufacturing a competing product.  Moreover, neither the Guide nor the information

summarized on the Guide, were treated by Polysciences as confidential during Mr. Masrud's

tenure with Polysciences.  For example, in addition to the fact that the Guide was intended to be

given to potential customers to help them make a selection:  (1) specific product specifications

were provided upon request to potential and existing customers; (2) Polysciences published a

Certificates of Analysis on its website that contained product specifications; and (3) Polysciences

published the heavy metals specifications for its MAXgene GMP product on its website.  *Id.* ¶

28.  These facts bely the feigned outcry that Mr. Masrud emailed himself the product

specifications and quality guide for any nefarious purpose.

    G.     **POLYSCIENCES HAS BROUGHT THIS ACTION IN BAD FAITH.**

It is obvious that Polysciences seeks to use baseless claims to attempt to impose a

restriction on competition that Mr. Masrud never would have agreed to during his employment

with Polysciences.  Polysciences provides no basis for its claims – other than its bald assertion

that PEI products could not possibly be manufactured in under 7 months without proprietary

know-how.  Tellingly, Polysciences largely ignores any focus on the products at issue in this

case – its PEI Max and Transporter 5 products -- because it knows the process is simple, and that

instructions to make a competing product are widely available in the public domain.

Polysciences' Complaint, Motion, and Declarations in support of its motion are entirely silent on

how long, or what was involved in its manufacture of PEI Max and Transporter 5.  Instead, those

court filings focus almost entirely on the alleged expense and time involved in manufacturing

these products through a GMP process even though ***Serochem has not developed or marketed a GMP product***.[3]

In an attempt to create alleged trade secrets where none exist, Polysciences has suggested that: common industry practices are somehow proprietary to it; information published on its own website is confidential and proprietary; information freely provided to potential customers is confidential and proprietary; and information widely published by third parties about both PEI transfection, PEI Max, and Transporter 5 are confidential and proprietary.

In an effort to bolster its case, at some point prior to this litigation, Polysciences attempted to remove some of this information from its website.  For example, it has removed links from its product pages to documents that contain information that it now claims is confidential and proprietary.  By way of example only:

- There used to be a direct link on the PEI Max product page to instructions about how to convert PEI Max to liquid form.  At some time prior to this litigation, Polysciences removed the link.  The instructions, however, are still available on Polysciences' website.[4]  Masrud Decl. at Exhibit "M."

---

[3] Even though the subject of a "GMP Process" is a complete red herring – **because Serochem *has not* developed or marketed a GMP product** – Polysciences deceptively emphasizes this process in its brief and will likely do so at the Preliminary Injunction hearing.  GMP refers to "Good Manufacturing Practice" regulations enforced by the FDA.  The regulations provide systems that assure proper design, monitoring, and control of manufacturing processes and facilities.  To be cGMP compliant means that the manufacturer has demonstrated a strong regulatory commitment and compliance to the current regulatory standards.  GMP compliance is required to validate food, drugs, and medical devices that are administered to humans or animals.  Undergoing the process to develop its GMP compliant product "MAXgene GMP" allows Polysciences to market and sell a transfection reagent for use in clinical trials and the manufacturing of drugs and gene therapies.  *See* Masrud Decl. ¶ 22.  It appears that Polysciences' true intention in bringing this lawsuit is to try and preventatively suppress *future* competition in that market.  Speculative fears about a future entrant into a marketplace does not equate to an evidentiary showing that trade secrets or confidential information was misappropriated.

[4] **Exhibit "5"** shows the PEI Max Product page on May 9, 2019 (as captured by web.archive.org) which contained a direct link to "Transfection Reagent Preparation and Storage Recommendations."  **Exhibit "6"** is the current product page and demonstrates that the link has been removed.

- There used to be a direct link to a Certificate of Analysis ("COA") for PEI Max on the PEI Max product page.  That link has also been removed.  Compare Exhibit "5" which contains a link to "Example COA" to Exhibit "7," which does not.  The COA, however, is still otherwise available on Polysciences website.  Masrud Decl. at Exhibit "S."

- There used to be a direct link on the Transporter 5 product page to detailed product information about Transporter 5, including the performance specification (i.e. the IgG Expression), which Polysciences claims is proprietary.[5]  The Transporter 5 Flyer is, however, still otherwise available on Polysciences website.  Masrud Decl. at Exhibit "T."

These facts suggest that in addition to grasping at straws to support its Motion, Polysciences may have been attempting to remove information from its website that bely its overbroad claims that everything about its PEI products, including product specifications and how to transform the powder into a liquid, are confidential and proprietary.

### III.   ARGUMENT

A.   **THE STANDARD TO OBTAIN INJUNCTIVE RELIEF IS HIGH AND POLYSCIENCES CANNOT MEET IT.**

Polysciences is improperly trying to quash legitimate competition based solely on speculation and disingenuous arguments.  A preliminary injunction is an "extraordinary remedy which should be granted only in limited circumstances."  *Instant Air Freight Co. v. C.F. Air Freight Inc.*, 882 F.2d 797, 800 (3d Cir. 1989).  To obtain this extraordinary relief, Polysciences bears a substantial burden of proof.  *See Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (A preliminary injunction is an "extraordinary and drastic remedy . . . that should not be granted unless the movant, by a clear showing, carries the burden of persuasion."); *Checker Cab Phila.,*

---

[5] **Exhibits "7"** shows the Transporter 5 product page on December 4, 2018 (as captured by web.archive.org) which contained a link to the "Flyer."  **Exhibit "8"** shows the current product page and demonstrates that the link has been removed.

*Inc. v. Uber Techs., Inc.*, 2015 U.S. Dist. LEXIS 26471, at *6-7 (E.D. Pa. March 3, 2015) (same).  Before granting an injunction, the court "must carefully weigh four factors:" (1) whether the movant has demonstrated a reasonable probability of success on the merits; (2) whether the movant will suffer irreparable injury if the injunction does not issue; (3) whether granting the injunction will result in "even greater harm to the nonmoving party"; and (4) whether granting the injunction serves the public interest.  *Gerardi v. Pelullo*, 16 F.3d 1363, 1373 (3d Cir. 1994). The movant's "failure to establish ***any*** element renders a preliminary injunction inappropriate." *Ferring Pharms., Inc. v. Watson Pharms., Inc*., 765 F.3d 205, 210 (3d Cir. 2014) (emphasis added).

Here, Polysciences fails to establish any, let alone all, of the prerequisites necessary to obtain injunctive relief.  The extreme remedy of injunction is not warranted under these circumstances.  Accordingly, this Court should deny Polysciences' Motion.

B.  **POLYSCIENCES HAS NOT DEMONSTRATED A LIKELIHOOD OF SUCCESS ON THE MERITS.**

Polysciences' request for extraordinary injunctive relief is based upon claims against Masrud for breach of contract and misappropriation of trade secrets under Pennsylvania and federal law. Polysciences is not likely to succeed on any of its claims.

Polysciences bears the burden of showing the existence (and the use by Mr. Masrud) of a trade secret.  Under both the Pennsylvania Uniform Trade Secrets Act ("PUTSA") and the Defend Trade Secrets Act ("DTSA"), a "trade secret" must be unknown to and not readily ascertainable by others, and must be a piece of information that the holder of the secret goes to efforts to protect.  *Profit Point Tax Technologies, Inc. v. DPAD Group, LLP*, 2020 WL 759952, at *5 (W.D. Pa. Jan. 29, 2020) (defining a trade secret under the DTSA and PUTSA as information "(1) the owner has taken reasonable means to keep secret; (2) derives independent

11

economic value, actual or potential, from being kept secret; (3) is not readily ascertainable by proper means; and (4) others who cannot readily access it would obtain economic value from its disclosure or use."  Moreover, trade secrets must be "particular secrets of the complaining employer and not general secrets of the trade in which he is engaged."  *Capital Bakers v. Townsend*, 426 Pa. 188, 192, 231 A.2d 292-4 (1967).

Polysciences' 32-page brief includes only vague buzz words generally used to describe trade secrets, such as "recipes," "productions procedures," "manufacturing programs/processes" "raw material suppliers," "compositions," "specifications," "testing procedures," and "quality control procedures."  *See, e.g.*, Compl. ¶¶ 4, 42, 73; Mem. of Law, pp. 4 and 7.  However, Polysciences never actually specifies in any meaningful way the trade secrets it seeks to protect, as is required under the applicable law.  *Synvgy, Inc. v. ZS Assocs, Inc.*, C.A. No. 07-3536, 2013 WL 3716518 at *2 (E.D. Pa. July 15, 2013) ("[A] trade secret plaintiff must identify its trade secrets with a reasonable degree of precision and specificity that is particular enough as to separate the trade secret from matters of general knowledge in the trade or of special knowledge of persons skilled in the trade.").

Not only do Polysciences' allegations lack sufficient specificity, the information that Serochem needed to create a competing product was simply a combination of standard industry knowledge or publicly available documents.  As such, there is no basis to ***assume*** that Serochem was incapable of creating a competing product without Polysciences' confidential and/or proprietary "know how."

Methods and information to make an effective PEI transfection reagent, including the molecular weight distribution, structure, and liquid reagent formula are available through published literature.  By way of example, the following information is public:

12

- The raw ingredients, with the key ingredient being PEOx, with a recommended average molecular weight of anywhere between 40,000 to 54,000 Daltons ("Da.") Masrud Decl. ¶¶ 12, 13.

- Sources for the raw materials. *Id.* ¶ 13.

- Instructions on how to mix and heat the materials to make the powder form. *Id.* ¶ 14.

- Instructions to transform the PEI powder into a liquid. *Id.* ¶ 19-20.

- The qualitative molecular weight distribution of the transfection reagents (i.e. the final product) from both Polysciences' PEI Max, and Polyplus' competing PEI transfection reagent product, PEIpro®. *Id.*, Ex. "K" at p. 3.

Information specific to Polysciences' products, which it now claims is confidential/proprietary, is in actuality either on its website or otherwise available in the public domain.  This includes:

- Some specifications for Polysciences' transfection products were provided to prospective customers upon request and without a confidentiality agreement. Others are available on its website.  *Id.* ¶ 28.

- The recommendation to refrigerate (i.e. store at 4° C) not to freeze the product in liquid form. *Id.* ¶ 38.

Other information that Polysciences alleges is confidential/proprietary is standard industry knowledge and/or easily ascertainable on-line, such as:

- Standard chemistry equipment is used to create the products. *Id.* ¶ 15.

- The process and compounds to adjust pH are standard industry knowledge.

- The identity of third-party testing companies can be found online.

- Sterile filtering processes are standard industry knowledge.

- The quality control process of checking the purity and performance of transfection reagents.

Polysciences has not identified with specificity the trade secrets (not otherwise available to the public) that give it an alleged "competitive edge,"  and it cannot rest solely on the argument that the products are similar and thus a misappropriation must have occurred. *See e.g.*,

13

*Vital State Canada, LTD. v. DREAMPAK, LLC*, 303 F. Supp. 2d 516, 527 (D.N.J. 2003) (denying plaintiff's motion for a preliminary injunction and noting that it could not meet its burden of showing a misappropriation of trade secrets by pointing to similarities in the competing products formula without pointing to a specific trade secret).

Polysciences' claim that Mr. Masrud misappropriated its confidential "customer pricing" and "sales history" (Compl. ¶ 73; Mem. of Law, p. 7), which it alleges is "one of [its] closest held and most valuable secrets" (Mem. of Law at 18),  is baseless when you consider the fact that Polysciences publishes its prices on its own website!  Archived and current information on Polysciences' website show that between May 2019 and August 2020, the price for one gram of PEI Max rose from $345 to $1,035, while the price for 5 mL of Transporter 5 rose from $95 to $285.  *Masrud Decl.* ¶ 21.  Similarly, information posted on Polysciences' website shows that between December 2018 and August 2020, the price for 50 mL of Transporter 5 rose from $495 to $1,185.  *Id.*

As to Polysciences allegation that Mr. Masrud breached his Confidentiality Agreement, it points to a single product Guide (which will be provided to the Court in camera at the hearing) that Mr. Masrud emailed to himself to edit for Polysciences while working remotely from a home office in Minnesota for Polysciences.   Polysciences has not suggested how the product Guide would be useful to Mr. Masrud/Serochem (because it is not).  Nor has it provided any basis whatsoever to suggest that Mr. Masrud used or disclosed any information on the Guide (which he did not).  Most importantly, attempting to classify the Guide as "confidential" for purposes of this lawsuit does not alter the reality that Polysciences did not previously treat the information on the document as proprietary.

C.    **POLYSCIENCES CANNOT DEMONSTRATE IRREPARABLE HARM.**

Polysciences cannot demonstrate the second required element to obtain injunctive relief:

14

irreparable harm.  Polysciences must show that an injunction is necessary to prevent "an imminent injury such that legal or equitable relief at the end of trial will not remedy the harm." *Marblelife, Inc. v. Stone Resources, Inc.*, 759 F. Supp. 2d 552, 562 (E.D. Pa. 2010).  "The availability of adequate monetary damages belies a claim of irreparable injury."  *Frank's GMC Truck Center, Inc. v. General Motors Corp.*, 847 F.2d 100 (3d Cir. 1988) (denying a preliminary injunction where the plaintiff's loss of income alone did not constitute irreparable harm); *Marblelife*, 759 F. Supp. 2d at 562 (noting that irreparable harm "must be of a peculiar nature, so that compensation in money alone cannot atone for it.").

First, Polysciences asserts that the mere fact of misappropriation of a trade secret constitutes irreparable harm.  That is a misstatement of the governing law – courts have held that "irreparable harm will not be presumed merely because the elements of a trade secret claim have been satisfied. Instead, a party seeking a preliminary injunction must make 'a clear showing of immediate irreparable injury.'" *Freedom Med., Inc. v. Whitman*, 343 F. Supp. 3d 509, 523 (E.D. Pa. 2018) (*quoting Campbell Soup Co. v. ConAgra, Inc.*, 977 F.2d 86, 92-93 (3d Cir. 1992)). Polysciences must make a clear showing not only that its confidential information has been misappropriated but that it has been used or disclosed.  *See All. Life Scis. Consulting Grp., Inc. v. Fabriczi*, No. 17-864-CDJ, 2017 U.S. Dist. LEXIS 132440, at *26-27 (E.D. Pa. Aug. 17, 2017) (no preliminary injunction relief where plaintiff simply assumed disclosure).  Polysciences has offered only base speculation to support its allegations that Masrud used its confidential information to develop its competing products, and it has come nowhere close to establishing the requisite "clear showing" required under the law.

Next, Polysciences asserts that monetary damages are not an adequate remedy in this matter because Masrud "has acted to steal and use in competition the core of Polysciences'

business." (Mem. of Law at 25.) This assertion is belied by Polysciences' own Vice President. According to the Declaration of Andrew Ott, Polysciences has been in business for almost sixty years, has three broad divisions, and approximately 2000 products.  Ott Decl. ¶¶ 3-4, 15.

Polysciences further asserts that Masrud launched competing versions of the "two most profitable products with the highest growth potential after starting Serochem," (Ott Decl. ¶ 15), but a close review of the pleadings suggests that is not in fact the case.  To put it simply, Masrud is accused of selling copycats of Polysciences' PEI Max and Transporter 5 products.  However, it is the GMP products that that have driven the astronomical increase in sales Polysciences touts to show the success of PEI products.  Polysciences' Vice President, Andrew Ott, testified as follows in support of their moving papers:

> Polysciences used those products [PEI Max and Transporter 5], which had been developed "over many years prior," to develop its cGMP products. (Ott Decl. at ¶ 10.) It is "[w]ith the addition of these cGMP products" that "Polysciences' PEI product sales tripled from 2018 to 2019, and in 2020, are expected to triple." (*Id*.)

Masrud is not selling cGMP products.  Polysciences' sleight-of-hand efforts to conflate the two different types of products cannot serve as a basis to claim irreparable harm.

Polysciences seems to recognize the disingenuous nature of its attempt to conflate the two product lines, asserting that "it is highly likely that Mr. Masrud will use his non-GMP products as a lead into developing and selling a GMP PEI Product." (Mem. of Law at 27.) There is absolutely no basis for Polysciences' speculation on that point.  *See Continental Group, Inc. v. Amoco Chems. Corp.*, 614 F.2d 351, 359 (3d Cir.1980) ("Injunctions will not be issued merely to allay the fears and apprehensions or to soothe the anxieties of the parties. Nor will an injunction be issued to restrain one from doing what he is not attempting and does not intend to do.") (internal quotation marks omitted). What Polysciences thinks Masrud might do is ***not*** a basis for the extraordinary relief requested here.

Regardless of which type of PEI products Masrud is selling, however, Polysciences cannot seriously claim that it will suffer an irreparable injury if Serochem is permitted to continue to sell PEI products. Each sale will be recorded in a manner that will allow Polysciences to determine to the penny how much Serochem earned from the sales of these PEI products. If Polysciences can document that those are sales that Polysciences would have made but for Masrud's alleged improper acts, the injury to Polysciences is readily calculable. Monetary damages are more than adequate to remedy any alleged injury.

Finally, Polysciences asserts that Masrud will cause it irreparable damage by injuring its goodwill and reputation by selling alleged inferior products at a lower price. (*See* Mem. of Law at 28.) Polysciences is asking this Court to drive a competitor out of business because it will be irreparably harmed when start-up company Serochem sells two competitive products at a competitive price when Polysciences has been in existence for over 60 years and sells thousands of products. It belies logic that a well-established and well-regarded company will lose significant market share if Serochem's products are the cheap knockoffs that Polysciences believes them to be. If Polysciences ultimately can prove that Masrud engaged in misconduct and that Polysciences has been injured as a result, Polysciences can seek appropriate monetary damages. What Polysciences should not be permitted to do is use meritless litigation to quash competition.

Contrary to its grandiose claims of irreparable harm, at the end of the day, Polysciences is concerned that Serochem's competing products, which it developed using publicly available information, will cut into Polysciences' exorbitant profits. This is not irreparable harm. As the United States Supreme Court has held:

> [t]he temporary loss of income, ultimately to be recovered, does not usually
> constitute irreparable injury. The key word in this consideration is irreparable.

> Mere injuries, however substantial, in terms of money, time and energy
> necessarily expended in the absence of a stay are not enough.

*Sampson v. Murray*, 415 U.S. 61, 90 (1974) (citation omitted); *see also Acierno v. New Castle County*, 40 F.3d 645, 653 (3d Cir. 1994)). Moreover, "[e]stablishing a risk of irreparable harm is not enough." *ECRI v. McGraw-Hill, Inc.*, 809 F.2d 223, 226 (3d Cir. 1987).  Polysciences "has the burden of proving a 'clear showing of immediate irreparable injury.'" *Id.* (*quoting Continental Group, Inc. Amoco Chemicals Corp.*, 614 F.2d 351, 359 (3d Cir. 1980)).

Polysciences has offered nothing but unbridled speculation that it will suffer immediate irreparable harm if a start-up company is allowed to compete in a fraction of its market.

### D.   THE EQUITIES AND PUBLIC INTEREST CLEARLY TILT IN MASRUD'S FAVOR.

Before issuing an injunction, the court must consider "the potential injury to the plaintiff if an injunction does not issue versus the potential injury to the defendant if the injunction is issued."  *Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer Pharms. Co.*, 290 F.3d 578, 596 (3d Cir. 2002). Polysciences is a privately held corporation with a global footprint (*see* Complaint at ¶15); it has been in business for nearly sixty years and has, by its own admission, almost 2,000 products in just one division of the company alone. (*See* Ott Decl. at ¶¶ 3, 4, and 15.).  Masrud was terminated by Polysciences less than a year ago and has, in an effort to support himself and his family, started his own company, in which he has invested significant savings in order to get the business off the ground. Masrud Decl. ¶ 39.  After months of preparation, Serochem started to operate in early July 2020 and, to date, has earned under $600 from two products it sells. *Id.* ¶¶ 40.  If Polysciences is granted its requested relief, Masrud will be driven out of business and Polysciences will have eliminated a competitor without Masrud being given a fair opportunity to defend against these specious allegations.

There can be no doubt that, under the circumstances, Polysciences will suffer far less if the injunction is denied than Masrud will if he is required to cease all operation of his business. Masrud is *not* subject to a covenant not to compete, is *not* subject to a customer non-solicitation provision, and has *not* been shown to have used any of Polysciences' confidential information to launch his business. First, Polysciences terminated its consulting relationship with Masrud and now wants to finish the job by driving him out of business based purely on speculative allegations and conjecture.

The public interest will not be served if the injunction is granted. The public has a right to fair competition. *See Hess v. Gebhard & Co.*, 808 A.2d 912, 917 (Pa. 2002). *See Vector Sec., Inc. v. Stewart, 88 F. Supp. 2d 395, 401 (E.D. Pa. 2000)* (public benefits from companies competing fairly). Here, where Polysciences had not established even a scintilla of evidence to support its claims of misappropriation, Masrud should not be restrained from supporting his family and offering a competing product in the marketplace, which would contribute to the overall containment of the costs associated with the research and development of potentially life-saving medical treatments.  Depriving the public of Masrud's products, which force competitive pricing, would be clearly against the public interest.

## IV.     CONCLUSION

For the reasons set forth above, Defendant Joseph T. Masrud respectfully requests that this Court deny Plaintiff Polysciences, Inc.'s Motion for a Temporary Restraining Order and Preliminary Injunction and Dissolve the Stipulated Temporary Restraining Order entered by the Court on August 18, 2020.

Dated:  August 27, 2020                    HOMANS PECK LLC

                                           /s/ Julianne L. Peck
                                           Julianne L. Peck, Esquire

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

|  |  |  |
|---|---|---|
| POLYSCIENCES, INC., | : | |
| | : | |
| Plaintiff, | : | Civil Action No. 2:20-cv-03649-PBT |
| | : | |
| v. | : | |
| | : | |
| JOSEPH T. MASRUD, | : | |
| | : | |
| Defendant. | : | |
| | : | |

## CERTIFICATE OF SERVICE

I, Julianne L. Peck, hereby certify that on the 27th day of August 2020, the foregoing

document, Defendant Joseph T. Masrud's Memorandum of Law in Opposition to Plaintiff

Polysciences, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction, was

filed using the Court's electronic filing system and served upon all counsel of record via ECF

notification.

*/s/ Julianne L. Peck*
Julianne L. Peck, Esq.

20