## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| POLYSCIENCES, INC., | **CIVIL ACTION** |
| Plaintiff/Counter-Defendant | |
| | **DOCKET NO.: 20-cv-03649-PBT** |
| v. | |
| JOSEPH T. MASRUD,<br>MATHEW GRIFFIN, and<br>SEROCHEM LLC, | |
| Defendants/Counter-Plaintiffs. | |
| | |
| MATHEW GRIFFIN, | |
| Counter-Plaintiff, | |
| v. | |
| SCOTT A. KNORR, | |
| Counter-Defendant. | |

**PLAINTIFF POLYSCIENCES, INC.'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS PLAINTIFF'S AMENDED COMPLAINT AND FOR ATTORNEYS' FEES PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 37(B)**

## TABLE OF CONTENTS

I.  INTRODUCTION.................................................................................................1

II.  PROCEDURAL HISTORY AND FACTUAL BACKGROUND...................................2

    A.  Polysciences' Identification of its Misappropriated Trade Secrets in Response to Masrud's Interrogatory No. 5 .........................................................3

    B.  Polysciences' Compliance with the Court's Order..............................................6

    C.  Polysciences Further Identified its Misappropriated Trade Secrets in Response to Serochem's Discovery Requests and Indicated How They Had Been Misused by Defendants.........................................................................10

III.  LEGAL STANDARD AND ARGUMENT...............................................................17

    A.  Legal Standard...............................................................................................17

    B.  Polysciences Complied with the Court's Order................................................18

    C.  The *Poulis* Factors Weigh Against Dismissal...................................................23

IV.  CONCLUSION.................................................................................................25

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*AirFacts, Inc. v. de Amezaga*,
909 F.3d 84 (4th Cir. 2018) ......................................................................... 20

*Donnelly v. Johns-Manville Sales Corp.*,
677 F.2d 339 (3d Cir. 1982) ........................................................................ 25

*FMC Corp. v. R.W. Christy, Inc.*,
No. 86-5793, 1989 WL 27919 (E.D. Pa. Mar. 27, 1989) .................................... 17

*Gentex Corp. v. Sutter*,
No. 3:07-CV-1269, 2008 WL 5068825 (M.D. Pa. Nov. 25, 2008) ....................... 18

*Imperial Chem. Indus. v. Nat'l Distillers & Chem. Corp.*,
342 F.2d 737 (2d Cir. 1965) ........................................................................ 20

*Mallet & Co. Inc. v. Lacayo*,
16 F.4th 364 (3d Cir. 2021) ..............................................................20, 22, 23

*Nat'l Hockey League v. Metro. Hockey Club, Inc.*,
427 U.S. 639 (1976) ................................................................................... 17

*Poulis v. State Farm Fire & Cas. Co.*,
747 F.2d 863 (3d Cir. 1984) ....................................................17, 18, 23, 25

## I.    INTRODUCTION

The Motion to Dismiss the Amended Complaint and for Attorneys' Fees Pursuant to Federal Rule of Civil Procedure 37(b) (ECF No. 64) (the "Motion") filed by Defendants Joseph T. Masrud ("Masrud") and Serochem LLC's ("Serochem") (collectively, "Defendants") is baseless, mislabeled, and a thinly veiled effort to district the Court from the Defendants' misappropriation of Plaintiff Polysciences, Inc.'s ("Polysciences") trade secrets.  There is no basis for dismissal of Polysciences' well-founded claims or for an award of attorneys' fees or other sanctions. Polysciences has more than adequately disclosed the nature of the trade secrets at issue and complied with its discovery obligations and the Court's orders.  The same cannot be said for the Defendants, against whom multiple discovery motions are pending.  Presumably because they see it as the only available course of action when caught, Defendants seek to confuse the issues at hand, feign ignorance of the trade secrets they knowingly misappropriated, and to paint themselves as victims in this case rather than the wrongdoers they are.

Contrary to Defendants' representations in their Motion, Polysciences has repeatedly identified the trade secrets at issue here with specificity.  Further, Polysciences provided supplemental responses to Defendants explaining, in detail, the trade secrets misappropriated by the Defendants to launch their knock-off products.  Despite these extraordinary supplemental measures and good faith efforts, Defendants at once claim insufficient disclosure of the trade secrets they misappropriated and complain that the volume and detail of the misappropriated secrets is overwhelming.  That is, Defendants claim that the disclosure is both too little and too much.  This contradiction is telling.

With respect to the volume of Polysciences' disclosures, it is important to remember that Defendants' discovery requests asked Polysciences to identify *all* of its trade secrets, not just the ones that Polysciences alleges Defendants misappropriated.  Polysciences complied with such

overbroad requests in an effort to avoid discovery disputes and expedite the adjudication of this case. Polysciences alleges that Defendants misappropriated a smaller collection of trade secrets, and specifically identified that population in the very beginning of this litigation. The substance of each such trade secret is set forth in detail in a log and documents provided and specifically identified to Defendants. Because Polysciences has satisfied its discovery obligations and more than complied with the Court's orders, and because Defendants plainly seek to avoid liability unending baseless discovery fights, Polysciences respectfully submits that the Court should deny Defendants' Motion.

## II.   PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Polysciences filed this action to stop its former employee, Masrud, from misappropriating Polysciences' trade secrets and confidential information. *See* ECF No. 1. Masrud directly competes with Polysciences through his company, Serochem. Based on initial discovery revelations, Polysciences moved for Leave to File a First Amended Complaint, to join Mathew Griffin ("Griffin") and Serochem as defendants. ECF No. 24. The Court granted that motion. ECF No. 42.

From almost the outset of the case, the parties engaged in multiple and lengthy meet and confer efforts over various discovery disputes. This has led to the filing of several motions, many of which are still pending before the Court.[1]

_____

[1] *See, e.g.*, Polysciences' Motion to Compel Subpoena Compliance (ECF No. 26); Masrud's Motion to Compel De-Designation of "AEO" Materials (ECF No. 38); Polysciences' Motion to Dismiss Defendant Mathew Griffin's Counterclaims (ECF No. 53); Griffin's Motion to Modify Protective Order (ECF No. 56). After Polysciences and Masrud filed separate Motions to Compel Discovery (*see* ECF No. 23 and ECF No. 22), the Court ordered that both parties supplement their discovery responses. *See* ECF No. 47 (the "Court's Order").

The present Motion alleges that Polysciences never properly supplemented its response to Masrud's Interrogatory No. 5, as required in the Court's Order. This is incorrect, as Polysciences served supplemental answers on July, 20, 2021 (attached hereto as **Exhibit A**) and provided additional details in Polysciences' August 6, 2021 response to Defendants' deficiency letter (attached hereto as **Exhibit B**) and Polysciences' Responses to Serochem's First Set of Interrogatories (served on December 3, 2021 and attached hereto as **Exhibit C**). Polysciences has not evaded relevant discovery and has been completely forthcoming with the repeated identification of its trade secrets at issue. Polysciences clearly identified its trade secrets and has exceeded what it required by the Federal Rules of Civil Procedure to do so. The same cannot be said for the Defendants.

A.   **Polysciences' Identification of its Misappropriated Trade Secrets in Response to Masrud's Interrogatory No. 5**

Masrud's Interrogatory No. 5 reads as follows:

> **Masrud Interrogatory No. 5**: Describe Plaintiff's alleged confidential information, including trade secrets, proprietary recipes, production procedures, quality control procedures, manufacturing processes, pricing strategies, and any other "Trade Secrets" referenced in the Complaint that Plaintiff contends Defendant used in the manufacture and/or sale of Serochem's "PEI Prime Powder, Transfection Grade Linear Polyethylenimine" and/or "PEI Prime AQ 1 mg/mL Liquid Transfection Reagent" products.

Polysciences Answers to Masrud's First Set of Interrogatories are attached hereto as

**Exhibit D**. On September 17, 2020, Polysciences initially responded to Interrogatory No.

5 as follows:

> Polysciences believes Masrud has misappropriated at least the Polysciences Trade Secrets identified in response to Interrogatory No. 4. Pursuant to Fed. R. Civ. P. 33(d), Polysciences further directs Masrud to the Verified Complaint, the Cease and Desist letter sent to Masrud c/o Serochem LLC on July 8, 2020, and Polysciences' forthcoming documents produced in response to Request for Production Nos. 1, 2, 3, 4, 7, and 8. Discovery is ongoing. Polysciences reserves the right to amend and/or supplement this response, if appropriate, in view of

further fact and expert discovery, investigation and research regarding the issues raised in this Interrogatory.

*See* Exhibit D at Answer to Interrogatory No. 5.  Polysciences' response to Interrogatory 4 was as follows:

> Polysciences' Trade Secrets include at least the following: step-by-step, detailed manufacturing instructions outlining raw materials, process parameters, and other procedures to synthesize the PEI products, prepare the solution, and package the materials; design of the PEI chemistry, including molecular weight, molecular structure, product form, and process and compounds used to create the desired pH of the solution; key raw material supplier data and specifications; sourcing of novel and rare supply materials; internal test procedures and methods to determine key material characteristics; identification and selection of third party laboratories for testing of sterility, mycoplasma, heavy metals and endotoxin; identification and selection of third party testing partners to determine transfection efficiency, expression, and cell viability; selection of specific sterile filtering process parameters to avoid techniques that could adversely impact polymer properties; strategy to pursue development for improved solubility; the neutralization process and compounds used to produce the desired pH; customer lists including customer specific pricing and product specifications, customer contacts, product pricing and cost details and strategy, margins,  competitive strategy and product positioning, and sales history for top PEI products and future forecasts; and receipt of confidential information from customers for specific product-related projects.

> Further, Polysciences directs Masrud to the document produced as Attorneys' Eyes Only to Masrud on August 27, 2020.  Pursuant to Fed. R. Civ. P. 33(d), Polysciences also refers Masrud to Polysciences' forthcoming documents produced in response to Request for Production Nos. 3, 6, 8, 10, 13, and 14, which documents set forth in detail the Polysciences Trade Secrets and speak for themselves and are produced subject to the confidentiality order and the understanding that the order's terms will be honored even before the order's entry.  Discovery is ongoing. Polysciences reserves the right to amend and/or supplement this response, if appropriate, in view of further fact and expert discovery, investigation and research regarding the issues raised in this Interrogatory.

Defendants claim in their Motion that Polysciences merely provided "catch-all categories of trade-secret information."  *See* Brief in Support of Motion (ECF No. 64-1) at p. 5.  The above demonstrates that Polysciences catalogued specific trade secrets it believed Defendants had misappropriated.  Polysciences also produced 36 files containing the details of each of the trade secrets on August 27, 2020 to Masrud in connection with its response to Interrogatory No. 5, which

are referenced in the response above.  These documents included, for instance,  batch records (*see, e.g.*, POLYSCIENCES0000043-57 attached hereto as **Exhibit E**), development reports and design files (*see, e.g.*, POLYSCIENCES0000228-238 attached hereto as **Exhibit F**), quality control worksheets (*see, e.g.*, POLYSCIENCES0001324-1343 attached hereto as **Exhibit G**), and documents relating to Polysciences' business plan, customer lists, pricing strategies, and product line financial information (*see, e.g.*, POLYSCIENCES0001204-1234 attached hereto as **Exhibit H**).  One of these files also contained a document summarizing Polysciences' process for manufacturing its PEI Products.  *See* POLYSCIENCES0001199-1202, attached hereto as **Exhibit I**.  As the Court can see from these documents, Polysciences disclosed its formulas, methods for production, and key customer specific information from the very beginning of this litigation.  For example, Exhibit G is a Quality Control Worksheet for Polysciences' MAXgene Solution (26406).  This document, which is only a few pages long, shows Polysciences' quality control processes, which Polysciences claims as trade secret.  Further, the data recorded in this document is also secret.  And as stated in Polysciences' response, Defendants had access to this document while employed at Polysciences.  Thus, these documents **are** Polysciences' trade secrets.  One cannot get more specific than that.

Polysciences later provided a Trade Secret Log (POLYSCIENCES0002258-2260) (and later filed as Exhibit 3 to Polysciences' Opposition to Masrud's Motion to Compel Trade Secret Discovery, ECF No. 31), which listed these documents in an organized form and provided descriptions of the information in each listed document to further help identify the trade secrets Polysciences asserts Defendants misappropriated.  Although Defendants claim that the Trade Secret Log "in no way identified with particularly any alleged trade secrets," this is false.  As explained above, the documents provided *are* the trade secrets.  As another example, the batch

5

records for Polysciences PEI Products show the formula description of its products and the evolution of same. *See generally* Exhibit E. The formulation and method of how Polysciences developed and produces its PEI Products is trade secret information. Defendants' assertions lack any basis.

Notably, Defendants now complain about the number of ***pages*** each document contains. *See* Brief in Support of Motion at p. 5. The documents' lengths vary greatly: from as short as one page (for a document showing prospects for sales, attached hereto as **Exhibit J**) to fifteen pages (for batch records containing Polysciences' trade secret information , *see, e.g.*, Exhibit E) to then as long as almost 1,000 pages for an entire design file for Polysciences' GMP Solution. In any case it is illogical to suggest Polysciences be penalized for the length of its disclosed documents.[2]

After providing the above-quoted answer and corresponding documents containing Polysciences' trade secrets, the parties exchanged several deficiency letters and responses and engaged in lengthy of meet and confer efforts. However, set on eventually positioning the case for this Motion, Masrud continued to feign ignorance and refused to acknowledge Polysciences' answer. Masrud then moved to Compel Trade Secret Discovery (ECF No. 22), which Polysciences opposed (ECF No. 31).

**B.     Polysciences' Compliance with the Court's Order**

In response to the parties' respective motions to compel, the Court ordered that both Masrud and Polysciences be required to supplement their discovery responses. *See* the Court's

---

[2] Defendants suggest that their documents are not as voluminous, but that only proves the point – misappropriating Polysciences' Trade Secrets allowed Serochem to bypass years of research and development (and the accompanying costs and documentation) and launch Serochem's PEI Product with minimal effort.

Order, attached hereto as **Exhibit K**.  In accordance with the Court's Order, Polysciences

supplemented its answer to Interrogatory No. 5, which is reproduced below[3]:

**SUPPLEMENTAL ANSWER (July 20, 2021)**:

Subject to and without waiving its objections, incorporated herein, Polysciences additionally responds as follows:

Polysciences' believes that Serochem, Masrud, and Griffin used their knowledge of Polysciences' trade secret PEI product profit margin and revenue and other trade secret information, including Polysciences' sources of raw materials and customer lists to select PEI as Serochem's starting, and only, product.  Such information is contained in documents relating to profit margins, development costs customer identity and pricing, and product sourcing costs and sources.  Polysciences contends that Masrud would have never picked PEI to launch Serochem's business without knowing Polysciences' secret product revenues, profit margins, customer list, and source materials.  Serochem, Masrud, and Griffin selected and developed their specific PEI products and solicited Polysciences' customers by using Polysciences' Trade Secrets.

Once Serochem, Masrud, and Griffin used Polysciences Trade Secrets to select the PEI products to launch their business, they used their knowledge of Polysciences secret PEI product formulation methods to develop the specific Serochem PEI Products.   Essentially, Serochem's business was launched off the shoulders of Polysciences, which had spent years developing high quality PEI Products. Without knowledge and use of the Polysciences Trade Secrets, Serochem, Masrud, and Griffin would not, and could not, have launched the Serochem PEI Products in the time frame they launched them.   Polysciences' PEI Products underwent years of rigorous testing and incremental formulation modifications and changes to generate the high-quality PEI Products it sells today.   Serochem's PEI products and production methods were clearly derived from Masrud and Griffin's knowledge of the Polysciences Trade Secrets.    The key trade secrets relied and used by Serochem, Masrud and Griffin fall into the following categories: (1) the identity of Polysciences' customers for its PEI Products, particularly the customer specific volumes and product specific technical requirements (and sales strategy relating to said customers); (2) Polysciences' revenue  and  profits of its PEI Products, including, without limitation, customer specific pricing arrangements not publicly disclosed; and (3) the PEI product manufacturing details including key raw material requirements, product formulation, product batch records and testing of Polysciences' PEI Products.  Serochem, Masrud, and Griffin used their knowledge of these secrets to manufacture and/or sell Serochem's PEI Prime Powder, Transfection Grade Linear Polyethylenimine and/or "PEI Prime AQ 1 mg/mL

---

[3] Notably, Defendants only quote part of Polysciences' answer in their brief, which again, distorts the picture to the Court.

Liquid Transfection Reagent" products, which are essentially knock offs of the Polysciences' PEI Max and PEI Transporter 5 products.

By way of further answer, Polysciences asserts that the specific Polysciences Trade Secrets used by Serochem, Masrud and Griffin are contained in documents previously identified  on September 17, 2020, Polysciences' Trade Secret Log (POLYSCIENCES0002258-2260), which documents identified in the log describe in detail the Polysciences trade secrets.  Polysciences then directed Masrud to these specific trade secret documents by providing Bates numbers in a letter to counsel, dated October 30, 2020.  However, Polysciences now further reiterates that these documents contain the Polysciences Trade Secrets and specifically identifies the following documents that contain Polysciences Trade Secrets used by the Defendants to launch the Serochem PEI Products:

**Batch Records from PEI Max (M.W. 40,000)[4]**:

**Batch Records from Transport 5[5]**:

**Polysciences' Customer List and Financial Information Relating to Polysciences' PEI Products[6]**:

**Formulation Considerations (e.g., considerations of using acetone v. tetrahydrofuran; considerations in hydrolysis reaction time)[7]**:

---

[4] POLYSCIENCES0000080-87; POLYSCIENCES 0000151-156; POLYSCIENCES0013624-13645; POLYSCIENCES0019232-19235; POLYSCIENCES0019236-19243; POLYSCIENCES0019244-19251; POLYSCIENCES0019252-19263; POLYSCIENCES0019265-19286; POLYSCIENCES0019287-19307; POLYSCIENCES0019308-19325; and POLYSCIENCES0028266- 28284.
[5] POLYSCIENCES0000157-163; POLYSCIENCES000164-169; POLYSCIENCES0013652-13665; POLYSCIENCES0015241-15253; POLYSCIENCES0015254-15269; POLYSCIENCES0015910-15917; POLYSCIENCES0015960-15967; POLYSCIENCES0016045-16052; POLYSCIENCES0019660- 19668; POLYSCIENCES0019710-19711; POLYSCIENCES0021949-21953; and POLYSCIENCES0022022-22034.
[6] POLYSCIENCES0001203; POLYSCIENCES0002288-2293; POLYSCIENCES0002294; POLYSCIENCES0002295; POLYSCIENCES0002296; POLYSCIENCES0000354-419; POLYSCIENCES0000420-488; POLYSCIENCES0000489-537; POLYSCIENCES0000930-931; POLYSCIENCES0001174-1189; POLYSCIENCES0001204-1234; and POLYSCIENCES000966-1025.
[7] POLYSCIENCES0001199-1202; POLYSCIENCES0005220-5221; POLYSCIENCES0005538; POLYSCIENCES0015156-151567; POLYSCIENCES0015174 (attaching POLYSCIENCES0015175-15177); POLYSCIENCES0010638; POLYSCIENCES0016793; POLYSCIENCES0017975 (attaching POLYSCIENCES0017976-17978); POLYSCIENCES0021343 (attaching POLYSCIENCES0021344-21355);

Please note the designations under the confidentiality order and proceed accordingly.  While not an exhaustive list, these documents contain information relating to Polysciences' sales and profitability of its PEI Products, formulation of its PEI Products, manufacturing and testing of its PEI Products, marketing and pricing strategies of its PEI Products, and customers it sells its PEI Products to. Thus, these documents help define Polysciences' Trade Secrets.

Masrud had access to all of the aforementioned documents during his tenure at Polysciences.  Therefore, these documents show the specific type of information Polysciences believes Masrud misappropriated and used in the manufacture and/or sale of Serochem's PEI Prime Powder, Transfection Grade Linear Polyethylenimine and/or "PEI Prime AQ 1 mg/mL Liquid Transfection Reagent" products.

As seen from Polysciences' full supplemental answer, Polysciences did not "continue to rely on catch-all categories of information."  Brief in Support of Motion at p. 7.  Rather, Polysciences identified the trade secrets it asserts Defendants misappropriated, and stated for each: (1) the identity of Polysciences' customers for its PEI Products, particularly the customer specific volumes and product specific technical requirements (and sales strategy relating to said customers); (2) Polysciences' revenue and profits of its PEI Products, including, without limitation, customer specific pricing arrangements not publicly disclosed; and (3) the PEI product manufacturing details including key raw material requirements, product formulation, product batch records and testing of Polysciences' PEI Products.  It then again provided documents which specifically detail these trade secrets to Defendants.

For example, Polysciences claims that the pricing of its PEI Products offered to specific customer is a trade secret.  In the above supplemental answer, Polysciences directed Defendants to POLYSCIENCES000966-1025, which is attached hereto as **Exhibit L**.  This document is Polysciences' customer list of PEI purchases since April 2018.  In this document, one can see (1)

---

POLYSCIENCES0022939-22940 (attaching POLYSCIENCES0022941-22942); POLYSCIENCES000023062 (attaching POLYSCIENCES0023063-23074); and POLYSCIENCES0036204-36208.

Polysciences' customers, (2) the products purchased by the customers; (3) the price at which the product was sold to the specific customer; and (4) the total sales amount by customer. As stated in its Interrogatory answer, Masrud had access to the documents listed during his tenure at Polysciences. Polysciences believes that Masrud used the information in these documents to jumpstart his directly competing business venture. Given Polysciences specificity, to allege that Polysciences has provided no indication of what information constitutes a misappropriated trade secret is simply bewilderingly.

### C.   Polysciences Further Identified its Misappropriated Trade Secrets in Response to Serochem's Discovery Requests and Indicated How They Had Been Misused by Defendants.

On October 20, 2021 Serochem served its First Set of Interrogatories on Polysciences, which Polysciences responded to on December 3, 2021. *See* Polysciences Answers to Serochem's First Set of Interrogatories (Exhibit C). Again, trying to avoid any unnecessary objections and/or motion practice, Polysciences provided a detailed narrative, specifically identifying the trade secrets it asserts Defendants misappropriated. It then provided evidence, based on what has been provided so far in discovery, to show said misappropriation and provided specific details about *why* said documents and information are trade secret information. For example, Interrogatory No. 1 states as follows:

> **Interrogatory No. 1**: Identify with specificity each Serochem raw material requirement, product formulation, manufacturing method, production protocol, equipment used, equipment parameter, product specification, or testing procedure that Plaintiff contends constitutes use by Serochem of Polysciences' trade secrets and/or confidential information.

Polysciences responded by specifically stating:

> However, by way of further answer, Polysciences also states that Serochem uses at least the following Polysciences trade secrets / confidential information:

███████████████████████████████████████████

10



[REDACTED]

*See* Exhibit C, at Answer to Interrogatory No. 1.

As seen from Polysciences' answer to Masrud's Interrogatory No. 4, which is incorporated in response to Interrogatory No. 5, Polysciences has always asserted the specific ways it developed, formulates, and manufactures its PEI Products are trade secrets. *See, e.g.*, Answer to Interrogatory No. 4 (claiming Defendants misappropriated the "step-by-step, detailed manufacturing instructions outlining raw materials, process parameters, and other procedures to synthesize the PEI products, prepare the solution, and package the materials"). In the answer provided above, Polysciences points to specific examples of how Defendants are using Polysciences' trade secrets and confidential information in the production of the Serochem PEI Products [REDACTED]

[REDACTED] Notably, Polysciences specifically mentions that [REDACTED] thus specifically calling out what Polysciences considers part of its trade secret information. While some of these pieces of process *may* be available in the public domain, the precise way Polysciences puts all the pieces together to formulate and manufacture its PEI Products is not.

Polysciences also expanded on this answer in response to Serochem's Interrogatory No. 2:

**Interrogatory No. 2**: the extent that Plaintiff contends that Serochem is using a particular combination or compilation of known raw material requirements, product formulations, manufacturing methods, production protocols, equipment, equipment parameters, product specifications, and/or testing procedures that it contends constitutes a unique combination that embodies a trade secret belonging to Polysciences, identify with specificity the unique combination.

**Polysciences' Answer to Interrogatory No 2**:

Polysciences refers to its answer provided in response to Interrogatory No. 1. Polysciences states that it does claim a unique combination or compilation of raw material requirements, product formulations, manufacturing methods, production protocols, equipment, equipment parameters, product specifications, and testing procedures for its PEI Products that it contends constitutes a unique combination that embodies trade secrets belonging to Polysciences. Polysciences asserts that Serochem is using Polysciences' trade secrets and/or confidential information comprising unique combinations of methods and procedures in Serochem's processes and methods including the combination of raw materials, product formulation, manufacturing methods, production protocols, equipment used, equipment parameter, product specification, and testing procedures for its PEI Products. Based on a review of the Serochem's research and development efforts Masrud has provided, the prior art references provided, and Serochem's batch records, it is evident that Serochem used Polysciences' trade secrets and confidential information to develop and produce Serochem's PEI Products. At every phase of the development and production of Serochem's PEI Products, there is clear evidence of Serochem's reliance on Polysciences' trade secrets, such as noted in response to Interrogatory 1. By way of further answer Polysciences refers to the expert report(s) to be provided at the appropriate tine in accordance with the Court's scheduling order.

Further, the unique combination of formulation, processes, and testing that embodies Polysciences' trade secrets are detailed in Polysciences' batch records, quality assurance and quality control documents, and other product development documents, which can be at least found in the documents below:

**Batch Records from PEI Max (M.W. 40,000)[8]**: [BATES NUMBERS OMITTED]

**Batch Records from Transporter 5**: [BATES NUMBERS OMITTED]

**Quality Control / Quality Assurance Documents:** [BATES NUMBERS OMITTED]

*See* Exhibit C, at Answer to Interrogatory No. 2.

Finally, in response to Serochem's Interrogatory No. 3, Polysciences explained *why* each of the above-mentioned trade secrets are in fact worthy of trade secret protection and specifically included the identification of what makes each trade secret unique and not publicly known.

---

[8] For the remainder of the Interrogatory answers, Polysciences omits the actual Bates Numbers for brevity.

**Interrogatory No. 3**: For each trade secret identified in response to Interrogatory Nos. 1 and 2 provide all facts that support Polysciences' trade secret claim, including without limitation, by identifying: (a) an estimated cost of development of each alleged misappropriated trade secret; (b) the specific nature and functionality of each alleged trade secret which makes it a trade secret, and (c) what makes the alleged trade secret unique and not commonly known in the industry or the general public.

**Polysciences' Answer to Interrogatory No. 3**:

Polysciences refers to its answer provided in response to Interrogatory Nos. 1 and 2. Polysciences' trade secrets are identified in its production processes and quality control procedures. Polysciences' trade secrets relate to the formulation and processing procedures of its PEI Products. These trade secrets enable Polysciences to produce a high-quality product that is highly sought after, as seen by its customer demand. Evidence of the value of the secrets includes, without limitation, the sales and profit information produced in this case in response to other requests which are incorporated by reference herein, including the response to Interrogatory No. 10 below. Regarding the costs of development, costs are not tracked per secret, but rather by product. However, by way of further answer, Polysciences estimates its direct out of pocket costs to develop the trade secrets used by Serochem in the production of Serochem's PEI Products cost Polysciences no less than $600,000 of direct out of pocket costs plus substantial amount of internal time and other indirect costs. When aggregated with out-of-pocket costs, this total number exceeds at least a $1,000,000 of costs to Polysciences. By way of further answer Polysciences states that Scott Knorr, Vice President, Sales & Business Development of Polysciences can speak further to these costs via deposition. Further, Polysciences states as follows:

(a) For over fifteen years, Polysciences invested at least a million dollars (including internal and external costs) into developing superior PEI products to what is, or was previously, available to the public. To do this, the scientists at Polysciences underwent a costly process of continuous improvement and development that optimizes the manufacturing methods and processes to produce consistent high-quality product that customers require. This involved extensive testing and multiple revisions to its formulations and methods of production to ultimately achieve the high-quality products Polysciences sells today. The iterative formulation and processing changes and the continuous testing activities are all reflected in the documents produced to date in the case. Additionally, Polysciences spent four years alone developing its cGMP PEI Products. By way of further answer, Polysciences directs Serochem to at least the following documents regarding its developmental and production costs: [BATES NUMBERS OMITTED]

14

Please note the designations under the confidentiality order and proceed accordingly. Polysciences also incorporates at least the batch records listed in response to Interrogatory No. 2.

(b) Polysciences states that the value of the Polysciences Trade Secrets can be seen from Polysciences' position in the market and high profitability (see e.g. response to Interrogatory 10 below). Polysciences has become renowned for its high quality and superior performance of its PEI Products for transfection. *See* Amended Complaint at ¶¶ 21, 24, 25-26, 30, 32, 33, 44-45. Additionally, pursuant to Fed. R. Civ. P. 33(d), Polysciences also refers Serochem to the following documents: [BATES NUMBERS OMITTED]

Please note the designations under the confidentiality order and proceed accordingly.

(c) The trade secrets are unique because they are not generally known in the industry, and they are critical to Polysciences' ability to cost effectively produce high-quality PEI products that are in demand with Polysciences' customers. Further, Polysciences takes numerous steps to secure the confidentiality of its trade secrets and confidential information identified in this case. First, all Polysciences employees (including Griffin and Masrud) are required as a condition of employment to sign an agreement to maintain the confidentiality of trade secrets and other confidential information. Polysciences' email and ERP (enterprise resource planning) system (BatchMaster with SAP Business One) are further protected by password protected accounts. The ERP is hosted by Microsoft Azure server, and users are required to have a username / password to access the remote desktop hosted on the server and an additional username/password to access the SAP/BatchMaster application. Access to the ERP system, which contains production records, formulations, quality control testing requirements, raw material information, and sales data is further limited to a portion of the employees (approximately thirty percent of all Polysciences employees and affiliates) with need to access the ERP system in order to perform their job. Likewise, key sales information, business plans, and strategic communications with clients is maintained in a Customer Relationship Management (CRM) system (SalesForce), protected share drive folders, and email communications with access limited to a small number of sales managers, senior leaders, and owners of the company who have a need to access the information (representing less than 10 percent of the organization). Further, all Polysciences owned laptops are protected with a DriveLock password in addition to the username/password requirement.

In sum, Polysciences' formulations, production methods and procedures, financial information, critical customer information and communications are all maintained in confidence with access provided on a need-to-access basis. By maintaining these valuable secrets, Polysciences has achieved substantial economic success with its PEI products. The Polysciences' Trade Secrets therefore differ in

that when looking at each component of the Trade Secrets, one cannot find an identical match in the public domain.

*See* Exhibit C, at Answer to Interrogatory No. 3.

As seen from Polysciences' answers above, Polysciences **did not** merely provide generic or broad categories to answer Serochem's interrogatories. Defendants asked for ***all*** of Polysciences claimed trade secrets. Polysciences provided said documents to Defendants, all of which Defendants had access to during their tenure at Polysciences. Polysciences then, in its answers to Serochem's Interrogatories, identified the specific documents Polysciences believes Defendants have misappropriated based on discovery to date. Polysciences also outlined, through its narrative, specifically what it believes Defendants stole. It is Polysciences' burden to prove such theft, which it will show in its forthcoming expert disclosures. However, this is completely different standard from a fact discovery motion, and Polysciences has more than met its burden of production here.

Further, as explained below, it matters not whether pieces of Polysciences' methods are found in the public domain. As explained in response to Interrogatory No. 2, the specific way Polysciences develops, formulates, and manufactures its PEI Products (which can be seen from the documents Polysciences has provided during discovery and identified in its discovery responses) cannot be found in the public domain. Defendants have provided no evidence showing that Polysciences has ever made this information public. Rather, Polysciences has repeatedly asserted that the public does not know exactly how Polysciences produces its PEI Products. This information is protectable by trade secret law, which is the entire point of the case.

Defendants' Motion edits Polysciences' full answers to improperly make it seem like Polysciences did not adequately respond to Serochem's Interrogatories. *See* Brief in Support of Motion at pp. 9-14. Defendants would have the Court believe that there are simply no trade secrets

16

at issue here, as demonstrated by Defendants' continuous disregard of Polysciences' trade secret interests.[9]  Just recently, counsel for Masrud and Serochem sent "Attorneys' Eyes Only" designated documents to Matthew Griffin, a party who has not entered into the Protective Order and is not authorized to see said documents under the terms of the Protective Order.  *See* February 4, 2022 Email from counsel for Defendants, attached hereto as **Exhibit M**.  Counsel did not even try to rectify the mistake, but just left Polysciences' trade secrets vulnerable. Mr. Griffin represented that he promptly deleted the documents without reviewing them.

Defendants know they have a losing case and are trying to manufacture an issue to persuade the Court to dismiss this case. This tactic cannot be rewarded. The Court should deny Defendants' Motion to Dismiss in its entirety.

## III.   LEGAL STANDARD AND ARGUMENT

### A.   Legal Standard

Although a Court may dismiss a case for failure to comply with a Court order, "dismissals with prejudice or defaults are drastic sanctions, termed 'extreme' by the Supreme Court." *Poulis v. State Farm Fire & Cas. Co.*, 747 F.2d 863, 867-68 (3d Cir. 1984) (citing *Nat'l Hockey League v. Metro. Hockey Club, Inc.*, 427 U.S. 639, 643 (1976)); *see also FMC Corp. v. R.W. Christy, Inc.*,

---

[9] This is also evidenced by Defendants' proposed order submitted with the Motion. *See* ECF No. 64-4.  The proposed order requires that "[a]ny supplemental response to these interrogatories, including any documents referenced in response to these interrogatories, may only be designated 'Attorney's Eyes Only' by leave of Court after the filing of a motion for AEO protection upon a specific showing of a substantial likelihood of significant harm as to each alleged misappropriated trade secret."  ECF No. 64-4 at p. 2.  This essentially converts the Motion to Dismiss to another iteration of Defendants' Motion to De-designate Attorneys' Eyes Only documents (ECF No. 38) because Defendants would have the Court believe that no trade secrets exist in this case.  This is simply not true.  Counsel for Defendants either cannot, or is pretending to be unable to, understand the documents without her client and apparently refuses to hire an expert to assist in the review in the documents.  But as previously argued in its Opposition to Defendants' motion (*see* ECF Nos. 40 & 60) such information must be maintained as AEO due to the highly sensitive and proprietary nature of the documents and because the parties are direct competitors in the marketplace.

No. 86-5793, 1989 WL 27919, at *2 (E.D. Pa. Mar. 27, 1989) ("dismissal under the Rule is an extreme sanction, to be reserved for the most egregious behavior.").  Courts in the Third Circuit must consider the following factors before dismissing a case: "(1) the extent of the party's personal responsibility; (2) the prejudice to the adversary caused by the failure to meet scheduling orders and respond to discovery; (3) a history of dilatoriness; (4) whether the conduct of the party or the attorney was willful or in bad faith; (5) the effectiveness of sanctions other than dismissal, which entails an analysis of alternative sanctions; and (6) the meritoriousness of the claim or defense." *Poulis*, 747 F.2d at 868 (the "*Poulis* Factors").

## B. Polysciences Complied with the Court's Order

The Court need not even examine the *Poulis* Factors as Polysciences complied with the Court's Order.  As stated in the Court's Order, Polysciences needed to "set forth with ***reasonable*** particularly the trade secrets that Polysciences claims were misappropriated." Court's Order at p. 1 (emphasis added).  Polysciences met and exceeded that requirement.

The Court defines "reasonable particularity" as "meaning a plaintiff must provide the defendant with a sufficient description to put the latter on notice of the nature of plaintiff's claims and can discern the relevancy of any requested discovery." *Gentex Corp. v. Sutter*, No. 3:07-CV-1269, 2008 WL 5068825, at *1 (M.D. Pa. Nov. 25, 2008), *on reconsideration in part,* 3:07-CV-1269, 2009 WL 467313 (M.D. Pa. Feb. 23, 2009).  Despite Defendants' assertions of otherwise, Polysciences has made clear the nature of its claims: Defendants have misappropriated its trade secret information relating to (1) Polysciences' formulation and production of its PEI Products to develop and produce Serochem's Products; (2) Polysciences customers and customer specific pricing; and (3) Polysciences revenue and profits relating to its PEI Products.  Polysciences has specifically called out to Defendants documents produced during discovery that explicitly detail the trade secret information claimed.  *See, e.g.*, Exhibits E-J & L.  These documents were produced

as "Attorneys' Eyes Only" for they are not publicly available and were developed after "a costly process of continuous improvement and development that optimizes the manufacturing methods and processes to produce consistent high-quality product that customers require." *See* Exhibit C, Polysciences' Answer to Serochem's Interrogatory No. 3 at p. 14.

Polysciences has produced documents showing the development of, and current formulations for, its PEI Products.  By way of example, POLYSCIENCES0000043, labelled HX26406, contains the specific details for the production of MAXgene powder.  *See* Exhibit E. There is simply no need to "parse out" the trade secret information from this document as the entire document shows the precise unique and proprietary method used by Polysciences to produce its MAXgene powder, a claimed trade secret.  This entire document is part of Polysciences' trade secrets and has been in Defendants' possession since the beginning of this litigation (it was one of the original 36 files produced and identified in Polysciences' Answer to Masrud's Interrogatory No. 5).  Polysciences has repeatedly asserted that Defendants used this document to jumpstart their development of Serochem's PEI Products.  This is undeniably the "reasonable particularity" identification of its trade secrets required by Courts in this District. [10]

Further, to the extent Defendants argue that parts of Polysciences' trade secrets are available in the public domain, such argument is of no consequence.  Defendants have provided

---

[10] Defendants allege that Polysciences is defying the Court's Order by stating that it will rely on Expert Report(s) to support its trade secret misappropriation claims.  *See* Brief in Support of Motion at pp. 9-10.  As explained in its January 28, 2022 letter to counsel for Defendants, attached hereto as **Exhibit N**, Polysciences has already identified the trade secrets that it alleges Defendants have misappropriated.  Polysciences' forthcoming expert report(s) will serve to further show *how* Defendants have used the misappropriated Polysciences' Trade Secrets.  The Expert Report(s) will not proffer never before identified trade secrets.  Since Polysciences has already identified the trade secrets themselves, its reliance on expert reports to prove its case does not violate the Court's Order.  This is just yet another example how Defendants refuse to listen to Polysciences' explanations and instead are dead set on proffering a false narrative to the Court.

no evidence showing that Polysciences has ever published the information or documents it claims as trade secret.  Thus, Defendants' argument is irrelevant to this Motion as this is, at best, a substantive issue for trial, not an issue for a motion for sanctions.

Also, "[a] confidential compilation and organization of public information can amount to a trade secret."  *Mallet & Co. Inc. v. Lacayo*, 16 F.4th 364, 386 (3d Cir. 2021) ("Courts have long recognized that 'a trade secret can exist in a combination of characteristics and components, each of which, by itself, is in the public domain, but the unified process, design and operation of which, in unique combination, affords a competitive advantage and is a protectable secret.'") (quoting *AirFacts, Inc. v. de Amezaga*, 909 F.3d 84, 96 (4th Cir. 2018) (quoting *Imperial Chem. Indus. v. Nat'l Distillers & Chem. Corp.*, 342 F.2d 737, 742 (2d Cir. 1965))).  While Defendants allege that Polysciences has not identified this combination, this is simply untrue.  Polysciences asserts, and has stated in its discovery responses, that no one else in the industry produces PEI in the manner it does.  *See* Exhibit C, at Answer to Interrogatory No. 3 ("For over fifteen years, Polysciences invested at least a million dollars (including internal and external costs) into **developing superior PEI products to what is**, or was previously, **available to the public**.  To do this, the scientists at Polysciences underwent a costly process of continuous **improvement** and **development** that optimizes the manufacturing methods and processes to produce consistent high-quality product that customers require.   This involved **extensive testing and multiple revisions to its formulations and methods** of production to ultimately achieve the high-quality products Polysciences sells today.") (emphases added).

The way Polysciences formulated and produces its PEI Products *is* the unique combinations that Polysciences claims as trade secret.  *Id.* at Answer to Interrogatory 3(c) (stating that the trade secrets are not publicly known and providing detailed description of how it protects

its trade secrets from public disclosure).  Polysciences' formulations and methods are not public information.  Even if some component or method *may* be in the public domain, this does not mean that Polysciences' unique trade secret methods are public.  Indeed, Defendants have made no showing that Polysciences has disclosed these formulations and methods to the public.  These unique and proprietary combinations of raw materials, product formulations, manufacturing methods, production protocols, equipment, equipment parameters, product specifications, and testing procedures, are specifically spelled out in the Batch Records Polysciences has identified and produced during discovery.  *See, e.g.*, Exhibit C at Answers to Interrogatory Nos. 1-3.[11]  One only need to look at the documents to understand Polysciences' claimed combination or compilation that it contends is a trade secret.  Defendants must know this and are purposely acting dense, which is inappropriate.  Thus, the unique "combination of characteristics and components," even if some are individually in the public domain, is what gives Polysciences its "competitive advantage and [] protective trade secret."  *Id.*

Defendants' cited case law is also irrelevant.  In *Arconic Inc. v. Novelis Inc.*, the court found the plaintiff failed to describe its alleged trade secrets with reasonably particularity because:

> Arconic never explained where it disclosed any of the claimed 288 combinations to Novelis. As Novelis pointed out, various pieces of information were disclosed at different times, in different contexts, to different people. (Tr. at 86, ECF No. 521-7). Arconic never explained where it disclosed to Novelis a full combination or put Novelis on notice that Arconic claimed any particular combination as its trade secret. Arconic never explained the difference between its trade secrets and the general skill in the art or Novelis' pre-existing knowledge. Arconic never explained

---

[11] Contrary to Defendants' assertions, Polysciences is not for the first-time during litigation just now identifying its unique and proprietary compilation as trade secret.  *See, e.g.*, Brief in Support of Motion at p. 12.  Rather, Polysciences has always claimed its unique combination or compilation as a trade secret, which is evidenced in its Amended Complaint.  *See* Amended Complaint (ECF No. 45) at ¶¶ 4 (claiming, among other things "step-by-step, detailed manufacturing instructions"); 88 (identifying as trade secret Polysciences' "confidential proprietary recipes," i.e., combination or compilation).

21

how any of the 288 claimed trade secrets was distinct and qualified for protection. No. 17-1434, 2020 WL 7247112, at *15 (W.D. Pa. Dec. 9, 2020). Polysciences, however, has repeatedly pointed to specific documents detailing its trade secrets asserted in this case. Polysciences has also provided detailed explanations, in response to both Defendants' discovery request and deficiency letters, explaining *why* its trade secrets qualify for protection and are different from that in the public domain. *See, e.g.*, Exhibit C, at Polysciences' Answer to Interrogatory No. 3 (b) ("Polysciences states that the value of the Polysciences Trade Secrets can be seen from Polysciences' position in the market and high profitability (see e.g. response to Interrogatory 10 [12] below).") and (c) ("The trade secrets are unique because they are not generally known in the industry, and they are critical to Polysciences' ability to cost effectively produce high-quality PEI products that are in demand with Polysciences' customers. Further, Polysciences takes numerous steps to secure the confidentiality of its trade secrets and confidential information identified in this case.").

Unlike what Defendants suggest, Polysciences is not claiming everything as a trade secret. Nor does Polysciences make broad sweeping statements without providing any other information to support its allegations. As seen in Polysciences' answers to Serochem's Interrogatory Nos. 1 and 2 above, Polysciences has narrowly defined what (1) are Polysciences' Trade Secrets; (2) documents contain those trade secrets; and (3) documents Defendants had access to while at Polysciences. *Arconic* is thus inapplicable.

Similarly, Polysciences **only** cites *Mallet* for the narrow proposition that a unique combination can still be afforded trade secret protection even if some of its elements are found in

---

[12] Polysciences response to Interrogatory No. 10 provided precise numbers relating to Polysciences' profits and sales of its PEI Products to specifically support this statement.

the public domain.  But the facts before the court in *Mallet* were in complete contrast to that before the Court here.  Unlike in *Mallet*, Polysciences has specifically identified its trade secrets.  As seen from above, Polysciences has in fact identified "which formulas" qualify as trade secrets and has described in detail "characteristics or properties contributing specific competitive value to [Polysciences] that could serve as a marker for separating [Polysciences'] formulas from publicly available information or generally known formulas in the industry."  *Mallet & Co. Inc.*, 16 F.4th at 384–85.  Thus, *Mallet* is only applicable as far as its holding for what can qualify as a trade secret; it does not otherwise apply here.

Polysciences has complied with the Court Order and has reasonably identified the trade secrets at issue.  Therefore, the Court should deny Defendants' Motion.

### C.     The *Poulis* Factors Weigh Against Dismissal

Even if the Court believes that Polysciences has not reasonably complied with the Court's Order, which it has, the *Poulis* Factors weigh against dismissal of the Amended Complaint.

(1)  Polysciences is not personally responsible.   As stated above, Polysciences has repeatedly identified its trade secrets with particularity.  Any missing pieces are due to the lack of discovery received from Defendants.   In answering Polysciences' discovery requests (attached hereto as **Exhibits O and P**) Serochem refused to produce any additional documents, specifically those relating to the research and development of Serochem's PEI Products, instead stating that all responsive documents were produced by Masrud.   Polysciences' motion to compel third-party discovery from Griffin is also pending.   *See* ECF No. 26.   Either documents responsive to Polysciences' discovery requests do not exist, or Defendants are wrongfully withholding discovery.  If the former, this bolsters Polysciences' misappropriation claims, and if the latter, this supports the notion that Defendants are to blame for any alleged missing pieces in Polysciences' trade secret identification.  This factor therefore cuts against dismissal.

(2) Defendants have not been prejudiced.  Polysciences provided the requisite disclosures and repeatedly responded to Defendants' baseless discovery disputes.  Polysciences provided narratives, pointed to specific documents, and even described how Serochem's process for manufacturing PEI Products incorporates Polysciences' Trade Secrets.  The answers and descriptions fall on deaf ears.  Further, Polysciences recently learned that Defendants are using a backdoor method to sell its PEI Products without technically violating the stipulated temporary restraining order ("TRO").  By using as a distributor MilliporeSigma, which was not included in the restricted parties, Serochem can reach a broad audience and maintain a high level of sales, without technically violating the TRO.  Defendants' claim of prejudice is disingenuous.  This factor therefore also cuts against dismissal.

(3) There is no history of dilatory behavior by Polysciences.  As seen by the extensive meet and confer history, deficiency letters and responses, and motion practice, Polysciences has repeatedly tried to reason with Defendants.  Polysciences has not missed a discovery deadline, nor has it ever ignored Defendants' correspondence.  Defendants refuse to be satisfied with any answer and rather continuously try to convince the Court that no trade secrets exist here.  Again, this factor cuts against dismissal.

(4) There is no bad faith.  As detailed in response to the third factor above, Polysciences has continuously acted in good faith to identify its trade secrets at issue.  Unlike what Defendants suggest, Polysciences does not merely provide broad categories of information and try to "hide the ball" from Defendants.  Brief in Support of Motion at p. 23.  Rather, Polysciences has provided a Trade Secret Log, detailed descriptions of its trade secrets, and specifically pointed to documents evidencing its trade secrets.  Defendants will never be satisfied with Polysciences answers because

the truth does not support their narrative.  But that is not bad faith attributable to Polysciences.  This factor therefore cuts against dismissal.

(5)  The effectiveness of sanctions other than dismissal.   Should the Court believe Polysciences is deficient in its identification of trade secrets, the sanction of dismissal is far too severe given Polysciences' repeated good-faith effort to identify its trade secrets with reasonable particularity.  *See Donnelly v. Johns-Manville Sales Corp.*, 677 F.2d 339, 342 (3d Cir. 1982) ("dismissal is a drastic sanction and should be reserved for those cases where there is a clear record of delay or contumacious conduct by the plaintiff.").  Polysciences has provided adequate detail in its identification for Defendants to understand the documents and information they are accused of misappropriating.  Because Polysciences' actions have not been egregious or in blatant disregard for the Court's Order, should the Court believe otherwise, less severe sanctions can be imposed.  This factor therefore cuts against dismissal.

(6) The meritoriousness of the claim or defense.  As detailed in Polysciences' Answer to Serochem's Interrogatory No. 1, Polysciences can and will show that Defendants used Polysciences' trade secrets to launch Serochem's PEI Products.  Polysciences identified its trade secrets with  reasonable  particularity,  especially  considering  the  lacking  document  production received from Defendants.  Thus, Polysciences is likely to succeed on its claims at trial.  This factor again cuts against dismissal.

The *Poulis* Factors support denial of the Motion.  The Court should let this case proceed to trial.

## IV.    CONCLUSION

For at least the above stated reasons, the Court should deny Defendants' Motion to Dismiss in its entirety.

Dated: February 18, 2022　　　　　Respectfully submitted,

/s/ *Cali R. Spota*
**FOX ROTHSCHILD LLP**
Eric E. Reed
Steven J. Daroci
2000 Market Street, 20th Floor
Philadelphia, PA 19103
(215) 299-2741 – direct
(215) 299-2150 – fax
EReed@foxrothschild.com

Gerard P. Norton (*pro hac vice*)
Cali R. Spota (*pro hac vice*)
Princeton Pike Corporate Center
997 Lenox Drive
Lawrenceville, NJ 08648
(609) 896-3600 – telephone
(609) 896-1469 – fax
GNorton@foxrothschild.com
CSpota@foxrothschild.com

Jonathan R. Lagarenne (*pro hac vice*)
1225 17th Street
Suite 2200
Denver, CO 80202
(303) 383-7684 – direct
(303) 292-1300 – fax
jlagarenne@foxrothschild.com

*Attorneys for Plaintiff Polysciences, Inc. and*
*Counter-Defendant Scott A. Knorr*

## <u>CERTIFICATE OF SERVICE</u>

The undersigned hereby certifies that, on the below date, she filed the foregoing with the

Court using the ECF system, which will provide notice and a copy to the parties and counsel of

record.


Date: February 18, 2022                          <u>*/s/ Cali R. Spota*              </u>
                                                 Counsel for Plaintiff and Counter-Defendant